JOHNS–MANVILLE CORPORATION, Plaintiff,

v.

GUARDIAN INDUSTRIES CORPORATION, Vaughn Chenoweth, Joseph Church, Duane Faulkner, Kenneth Limburg, John Mikulak, Robert Nishwitz, Steven Sanford and James Schairer, Defendants.

Civ. No. 81–70248.

United States District Court, E.D. Michigan, S.D.

Dec. 20, 1983.

Ernie L. Brooks, Southfield, Mich., for plaintiff.

Bernard J. Cantor, Detroit, Mich., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP PRATT, District Judge.

Plaintiff Johns-Manville Corporation, a New York corporation[1] (hereinafter J–M), which is involved through its operating subsidiaries in the development and production of fiberglass insulation, has sued defendant Guardian Industries Corporation,[2] a Delaware corporation, and several former J–M employees[3] who have assisted defendant Guardian with its entry into fiberglass production. J–M alleges that defendant has appropriated both patented and unpa-

tented technology developed by J–M for the commercial production of fiberglass insulation that consists of fibers which are less than 7 microns (M) in diameter.

At the heart of plaintiff's development is a process for directly centrifuging fibers 7 M or less in diameter through holes less than 18 mils in diameter[4] which eliminates the need for a production process known as hot gas blast attenuation. The elimination of this energy intensive step in the production of insulation-quality staple fibers was a significant technological break-through in the field.

Implementation of this new process of fiberization required many alterations and adaptations to the existing fiberglass insulation production line and techniques used by Johns-Manville. As will be elaborated below, the new process was given the acronym HERM, which represents *H*orizontal laminar collection of the staple fibers, *E*lectric kettle melting of the glass, *R*otary fiberization through a spinner containing holes of less than 18 mils, and *M*odular line. The research, development, and resulting technology will be referred to generally as HERM, unless the context requires greater specificity. The HERM process has been commercialized and is on line at J–M facilities in Willows, California; Winder, Georgia; Richmond, Indiana; McPherson, Kansas; Innisfail, Alberta, Canada; and St. Avold, France.

## I. THE PARTIES

### A. *The Corporate Parties*

Both J–M and Guardian manufacture fiberglass insulation. J–M, the original

---

1. As a matter of convenience, plaintiff will hereinafter be referred to as J–M. On November 23, 1981, plaintiff J–M moved to add Manville Service Corporation, a Delaware corporation, as a party plaintiff to this action because it was the assignee of both the patent in suit and technology which J–M was claiming as trade secrets. Manville Service Corporation, like its predecessor Johns-Manville Corporation, is a holding company for the various Johns-Manville operating subsidiaries. J–M's motion was granted orally on November 23, 1981. The order was entered June 10, 1983.

2. Hereinafter referred to as Guardian or simply defendant, as the context dictates.

3. The individual employees who remain defendants in this suit will be identified by name, unless the context indicates the reference is to both Guardian and the individual employees collectively.

4. A micron is a unit of measure equal to one millionth of a meter, while a mil is a unit of measure equal to one thousandth of an inch. An inch equals 25,400 microns, so a mil equals 25.4 microns. By way of example, a 5 micron fiber has a diameter of about two ten-thousandths of an inch, that is, .0002. Defendant's Finding of Fact 25.

plaintiff herein, is a holding company which functions through various wholly-owned operating subsidiaries. At the inception of the HERM project, its employees worked for either J–M Fiberglass Inc. or J–M Products. Corporation. At some time, unspecified in the record, the corporate structure was reorganized and the HERM development project and its team came under the auspices of J–M Sales Corporation. The personnel records of Church, employed January 1976 by J–M Products, and Limberg, employed March 1977 by J–M Sales, support the inference that the transaction occurred in that interval.

Although the identity of the operating subsidiaries may have changed, the entity for which an employee worked had no bearing on his assignments or his obligations to both the subsidiary and the parent, J–M Corporation. Plaintiff's nonchalance about its corporate structure has made for an untidy and confusing record, but does not deprive the parent of its right to relief because a subsidiary was not joined as a party.

█ The Court is satisfied that individuals considered themselves to be J–M employees, regardless of the intervening subsidiary's identity, and that any obligations arising from their employment were owed to the parent corporation, and were unaffected by transfer from one subsidiary to another. Thus the Court finds no merit in defendants' claim that J–M has failed to join its subsidiaries as indispensable parties. Plaintiff J–M and its successor, Manville Corporation, to which all of J–M's rights have been assigned, are the only parties necessary to pursue all the claims before the Court.

J–M began research and development (R & D) in fiberglass insulation in 1956 and entered commercial production by purchasing both the facilities and technology, including the patents of a competitor, Libby Owens Ford. Prior to that time, J–M had been involved in both research, development and production of mineral or rock wool insulation. J–M remains commercial-ly active in both fields of insulation production.

Defendant Guardian is primarily a manufacturer of glass plates for automotive and architectural windows, and secondarily is involved in photo finishing. Defendant purchased a factory in Huntington, Indiana, for the production of rock wool insulation in 1977, and in November 1979 acquired a glass plant in Albion, Michigan, where the production line, which is the subject matter of this dispute, is located. Defendant began commercial production of fiberglass at its Albion facility in November 1980. To date, defendant has hired 15 former J–M employees, at least 9 of whom were directly involved with the development of the new fiberglass insulation technology which is the subject matter of this suit.

### B. *Individual Defendants*

The following are former J–M employees who are employed by Guardian at the Albion fiberglass insulation plant, as well as being named individual defendants. They are listed in order of their importance to both J–M and the HERM project and the start-up of Guardian's Albion line.

Duane Faulkner joined J–M's HERM team in June 1972, as an employee of J–M Fiberglass Inc., and was resident manager of the HERM project at the Richmond, Indiana plant. He developed a theoretical model which described the new fiberization process, was a named inventor on the patent in suit, which disclosed that model and claimed the process, and supervised development of the supporting technology necessary to commercialize the production of fiberglassing, the new fiberization process. Faulkner left J–M in October 1977 and, after a brief interval at Midland Glass during October and November 1977, joined Guardian. He was first employed at Guardian's Rock Wool plant in Huntington, Indiana, but became and remains Director of Operations of Guardian's Insulation Division, after defendant had committed to convert the Albion facility for fiberglass production in November 1979.

Defendant James Schairer was employed by J–M Fiberglass Inc. in May 1971, where he designed electronic fiberglass equipment controls, and was responsible for the onsite development work prior to Faulkner's arrival. For his last two years, Schairer reported to Duane Faulkner directly as Senior Process Engineer. He left J–M in January 1978 and began his employment at Guardian's Huntington Rock Wool plant in February 1978, as an engineering manager who assisted in bringing that facility on line by May 1978. He began purchasing equipment for the Albion fiberglass line in mid-February 1980, and is currently responsible for electrical designs.

Defendant Steven Sanford was employed by J–M Products Corporation in October 1969 and transferred to the HERM project in August 1972, where he designed and procured mechanical parts for the pilot line. He left J–M's employ in February 1980, and joined Guardian. He was employed at the Huntington Rock Wool plant for one month and transferred to Albion in April 1980 as a mechanical engineer in charge of the mechanical design for the fiberglass line.

Defendant Vaughn Charles Chenoweth was first employed by J–M Products Corporation in 1971 and transferred to the HERM development project in 1972 where he was involved with operation of the HERM equipment. He left J–M in October 1978 to work at the defendant's Huntington Rock Wool plant and ultimately transferred to the Albion fiberglass insulation plant where he is a manager of process and quality control. These four employees constituted plaintiff's HERM development cadre.

Defendant Kenneth Limberg was employed by J–M Sales Corporation in March 1977 as an hourly worker and advanced to become a research technologist, process technician, and a supervisor of operations on the HERM line. He also acted as a troubleshooter for the start up of commercial HERM lines and trained operating personnel at the Willows, Winder and Innisfail plants. Limberg left J–M in October 1980

and joined Guardian at its Albion facility where he is a production shift manager.

Defendant Robert Nishwitz was first employed by J–M Products Corporation in November 1974 as a draftsman and project engineer for the HERM line. In April 1978, he left J–M and worked as a project expediter for J.C. Beasley, Inc., for a five month interval. In October 1978, Nishwitz joined Guardian at the Huntington plant and transferred to the Albion operation in November 1979 where he is a maintenance supervisor.

Two other individual defendants who were named in the original complaint have since been dismissed from the suit by plaintiff: John Mikulak, an employee of J–M Fiberglass Inc., dismissed October 6, 1981, and Joseph Church, an employee of J–M Products Corporation, dismissed January 28, 1982.

Each individual defendant, regardless of the subsidiary which initially employed him, executed an employee agreement which provided:

That any and all inventions, discoveries or developments, whether sole or joint, relating to, or capable of use in conjunction with, the business of the Company or of Johns-Manville Corporation or of any subsidiary of Johns-Manville Corporation which the undersigned employee may either conceive, complete or first reduce to practice during the period of said employment, together with any and all models, descriptions, drawings and records relating thereto and any and all applications for Letters Patent and Letters Patent based thereon, are to be and become the property of Johns-Manville Corporation or its nominee;

\* \* \* \* \* \*

That except as required in his duties to the Company, the undersigned employee shall not disclose or use at any time, either during or subsequent to the said employment, any secret or confidential information of the Company or of Johns-Manville Corporation or any subsidiary of Johns-Manville Corporation (whether

or not developed by the undersigned employee) unless he shall first secure the Company's written consent;

That the undersigned employee understands that any information, formula, procedure, drawing, device or compilation of data which is used in the Company's business or that of Johns-Manville Corporation or of any subsidiary of Johns-Manville Corporation and which gives any of them an opportunity to obtain an advantage over competitors who do not know or use it, may constitute secret or confidential information.

\* \* \* \* \* \*

The undersigned employee further agrees that in the event of the transfer of his employment from the Company to any subsidiary, parent, or affiliated company thereof, his employment shall continue to be subject to each and all of the terms and conditions hereof, except as modified as herein provided for, and thereupon "the Company", as used in this agreement shall mean such subsidiary, parent or affiliated company....

## II. OVERVIEW

The gist of plaintiff's complaint against defendants Guardian and its named employees is that Guardian, with no prior background in the field, would have been unable to begin production of fiberglass insulation in so short a period of time without appropriating both plaintiff's patented fiberization process and the other techniques developed by J–M, and also the expertise of former J–M employees, including the individual defendants. In sum, plaintiff is accusing defendant of industrial piracy, and the Court is persuaded that the record sustains plaintiff's accusation.

Specifically, plaintiff has alleged appropriation of its trade secrets, unfair competition, breach of employment contracts and of fiduciary duty by the individual defendants, and infringement of the patent in suit. Although plaintiff has not sustained its burden of proof as to every detail of its claims, plaintiff has established by the preponderance of the evidence that the patent

in suit is valid, that defendant has infringed it, and that defendant appropriated numerous techniques and refinements which plaintiff has developed in connection with its commercialization of the fiberization process embodied in the patent in suit. Furthermore, plaintiff has established that certain of these techniques qualify for trade secret protection under Michigan law, and that the appropriation of those that do not creates a pattern of unfair competition. Finally, the Court is persuaded that certain former J–M employees have breached both their fiduciary duty to and their employment contracts with the plaintiff J–M.

### A. Procedural History

Plaintiff's suit initially did not include the patent infringement claim, but based on the other claims plaintiff moved for a preliminary injunction which was so far-reaching that, if granted, would have been tantamount to the grant of a permanent injunction. It was, therefore, agreed by counsel and the Court that discovery and other pre-trial procedures would be accelerated and the matter heard on the merits as soon as practicable.

Plaintiff, on May 5, 1981, filed an amended complaint alleging infringement of the patent in suit. During the course of pre-trial procedures, defendant filed various counterclaims, all of which have been dismissed by stipulation with the exception of those dealing with the validity of the patent and its infringement.

The non-jury trial commenced on October 19, 1981 and consumed 34 days of trial. The trial transcript consists of 4143 pages and 283 exhibits were introduced. The parties subsequently submitted proposed findings of fact and post-trial briefs. Final arguments were heard on June 10, 1982.

This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law as to liability, and as to plaintiff's motion for injunctive relief pursuant to Rule 52, F.R.C.P., it having been stipulated that the liability and damage issues would be bifurcated.

## B. *Credibility*

Many of the Court's findings of fact rest on the Court's underlying determination of witness credibility. The factual issues in this case have been numerous, and nearly every issue has been hotly contested.[5] Furthermore, the technical complexity has necessitated the Court's heavy reliance on expert testimony. Since plaintiff's expert Don Simmers, and defendants' expert, Duane Faulkner, have presented the Court with markedly differing versions of how the patented and accused processes work, the Court has been required to make an intuitive judgment as to the credibility of each witness, and abide by that where it has lacked the technical explanations to find its own way.

The Court finds Don Simmers to have been a credible witness, whose testimony never lacked consistency, and was verifiable by empirical evidence. He conscientiously acquitted his duty to inform and educate the Court.

On the other hand, Duane Faulkner was frequently a less than credible witness. Answers were often self-serving, evasive or in conflict with prior testimony. Specific incidents which support this conclusion have been detailed at appropriate places throughout the opinion. As a prefatory example, Faulkner's explanation as to the function of the accused Albion fiberizer was in direct conflict with the explanation in the patent application, No. 226,362 (filed January 19, 1981), on which he and Chenoweth were named co-inventors. His attempts to resolve the conflict were unpersuasive.

Furthermore, the other two defendants who also appeared as witnesses gave conflicting testimony as to matters of record.

Steven Sanford, when asked about his solicitation for employment at Guardian, testified that Schairer initiated the contact. This conflicts with Faulkner's testimony that it was Sanford who made the initial contact. Schairer did not testify and, therefore, the conflict was not resolved. Sanford also sought to minimize his role in the development work to that of mere draftsman. His status as inventor on three J–M patents belies that assertion.[6]

Likewise Chenoweth was unable to recall the sequence of events which led to his employment at Guardian, or the contents of the HERM operating manual, which he co-authored while at J–M. (Plaintiff's Exhibit 26). His explanation of the Albion fiberizer tracks Faulkner's explanation, which the Court has not found credible. On the whole, he was a poor witness with a weak memory and multiple conflicts in his testimony.

Sczesny, president of defendant Guardian Corporation, likewise suffered from lapses of memory concerning Guardian's intentions about fiberglass entry and early contacts with Faulkner. Plaintiff's counsel highlighted these discrepancies during his cross examination.

Suffice it to say, the Court finds that plaintiff's witnesses, on the whole, were more credible than were defendants' witnesses.

## III. FORMATION OF MINERAL FIBER INSULATION

This suit evolves from the course of J–M's development of a new method of producing fiberglass insulation fibers. Although the focus of this litigation is fiberglass technology—more specifically the

---

5. The contentiousness of counsel, which has exceeded the bounds of fervent advocacy and verged on personal animosity has been a significant factor in the protracted nature of the proceedings, especially the voluminousness of the record, much of which was created by counsel's arguments rather than witness' testimony, and, regrettably, the delay in this Court's rendering its opinion.

6. 1. Electric Furnace Outlet No. 3,912, 488 October 14, 1975
 2. Primary Electrode Arrangement for High Temperature Melting Furnace No. 3,983,309 September 28, 1976 Reissue No. 30,521 February 17, 1981
 3. Method and Apparatus for making Glass Fibers Utilizing an Oscillating Spinner No. 3,997,307 December 14, 1976 Reissue No. 30,-192 January 15, 1980

techniques of rotary fiberization—some knowledge of rock wool insulation processes is necessary to an understanding of the claims in this law suit.

The purpose of insulation is to prevent the mixture of air that has been heated or cooled to a desired temperature with air which has not been so conditioned in order to conserve the energy necessary to maintain the desired temperature. Mineral fiber insulation creates a dead air space by providing a matrix of short fine fibers which reduces the rate of exchange of air at the desired temperature with air of an undesired temperature range. Insulation fiber's effectiveness at reducing conduction increases as the diameter of the fiber is reduced. Optimal insulation properties exist when the mineral fibers are less than 7 M in diameter and less than 1 inch or so in length.

Production of mineral fiber insulation involves several steps common to both fiberglass and rock wool. The raw material or "batch" must be melted, turned into individual fibers of the appropriate diameter and length (the process known as fiberization), collected and packaged as either bats, long strips for roll insulation, or chopped into small pieces for blowing. The melting and fiberization processes constitute what is known in the trade as the "hot end". The collection and packaging processes are known as the "cold end". Both the patent and the trade secrets in dispute involve Guardian's alleged appropriation of J–M's developmental work regarding the "hot end".

### A. Rock Wool Insulation

Insulation fibers are formed by first melting the raw ingredients and then by some means transposing the melt into individual fibers. In rock wool production, the raw ingredients, such as rock or slag, are introduced into a melter and the resultant melt is drained through a bottom orifice and delivered to a fiberizing apparatus by a refractory lined trough. The melt may be turned into fiber by, for example, blasting it with high-pressure steam or pouring it onto a stacked set of rapidly rotating horizontal rollers. In each method, the primary product is composed of a head and a tail, in rough analogy, a comet with a tail. The tails are usable for insulation purposes while the heads or shots are not. These processes are commonly referred to as the shot propulsion method of fiberization.

### B. Fiberglass Insulation

Traditionally the formation of fiberglass insulation involves melting a premixed combination of minerals, primarily silica (the proportions depending on the desired properties), in a conventional melter, a large ceramic pot fired by fossil fuel. The batch is typically delivered by an auger feed on the side wall, and the resulting melt is delivered to a forehearth where its temperature is controlled until delivery to the fiberizing apparatus. The fibers are formed by positioning a stream (or streams) of molten glass in the path of a highly kinetic and high temperature stream of combustion gases.

In the flame attenuation process (known in J–M's vernacular as "pot and marble"), glass pellets, rough formed marbles, are loaded into a melter pot with quarter inch diameter bottom outlet orifices through which the molten glass exudes. The glass is soft, or plastic, at the orifices where the primary filaments (primaries) are formed. The primaries must go through two steps of "attenuation"—the process of stretching a glass fiber or rod at its plastic temperature to reduce its diameter. The plastic primaries are first attenuated mechanically by a pull roller. Pulling cools as well as stretches the fibers, so they are further attenuated to the appropriate diameter for insulation purposes (less than 7 M) by "flame attenuation", i.e. the partially attenuated primaries pass through the exhaust stream produced by a high impact jet of combustible gas and air. The high temperature stream resoftens the fibers and the high kinetic energy of the stream stretches the fibers to the appropriate diameter.[7]

---

**7.** Other processes similar in principle to the "pot and marble" method include the rotary jet and

The "pot and marble" method was the state of the art technology when J–M entered the commercial production of fiberglass insulation by acquiring Libby Owens Ford Glass Fibers, Inc., and purchasing all rights to LOF's technology, including patents. This acquisition augmented the research and development work which Donald Simmers, plaintiff's expert witness on glass fiberization in this suit, began for J–M in 1956.

The next step in the evolution of fiberglass technology at J–M involved Rotary Fiberization, or the S–X process—its inhouse designation at J–M which stands for "Simmers—Experimental". In this conventional rotary process, the batch is melted, the molten glass is stored in a temperature controlled forehearth and from there is introduced to the interior of a rotating disc, also known as a spinner, fiberizer or rotor.[8] In the S–X process, the spinner rotates at a relatively high rate of speed and, under the influence of centrifugal force, the molten material is diverted radially outward to the spinner walls, or peripheral bands, and through the holes in those bands. The holes on an S–X spinner are on the order of 25 thousandths of an inch (25 mils) or more. The centrifuged glass forms primary or centrifuged fibers on the order of 10 M or more in diameter, too large for use as insulation.

Heat from a hot gas chamber keeps the centrifuged fibers plastic, and the high temperature kinetic gas in the form of a gas blast from a high velocity blower attenuates the centrifuged fibers to product diameter less than 7 microns, and breaks them into staple fibers approximately 1½″ long, a desirable length to form a mat of fibers.

Both the heat and kinetic blast are necessary to accomplish what is termed "hot gas blast attenuation". The heat and high energy blast may come from a single or separate orifice. In the absence of this second-

ary HGBA, fibers produced by centrifuging or rotary fiberization through an S–X or other conventional rotor alone are too coarse to be used for insulation. J–M began developing its S–X Rotary Fiberization method in 1962, and still uses it for commercial production today. J–M's competitors in the field of fiberglass insulation, Owens Corning Fiberglass (OCF), Certainteed St. Gobain (CSG), and Knauf also use rotary fiberization. Knauf is a licensee of certain J–M technology. OCF and CSG are the owners of multiple patents in the field.

The technology contained in the patent in suit, and the trade secrets which are at the heart of this litigation, encompass the next phase of J–M's developmental work in rotary fiberization: an attempt to produce insulation quality fibers less than 7 M in diameter by directly centrifuging glass fibers through holes of sufficiently small diameters that no further external attenuation was necessary.

To assist in the experimentation, a pilot line was set up at J–M's Richmond, Indiana plant to develop a new manufacturing process involving both hot and cold end innovations. Throughout the course of this seven week trial, the hot end innovations were spoken of generically as HERM, although of HERM's four elements only *E*lectric Melting and *R*otary Fiberization are at issue in this suit. Furthermore, both witnesses and, to some extent, counsel used the acronym HERM to include alleged trade secrets relating to the hot end which were not directly related to either melting or fiberizing. Although the designation HERM in some contexts lacks precision, its usage is ingrained, and the Court will use it to designate J–M's developmental work that began in 1970. The term includes the patent in suit, and the alleged trade secrets, and was ultimately implemented for full scale commercial production at six J–M facilities.

The obstacles to and triumphs of the HERM development process can not be ful-

---

rotation processes.

**8.** Although the patent in suit discloses a horizontal spinner, other patents in the art disclose

spinners tilted at 45° angles or even on oscillating turrets.

ly appreciated without some basic understanding of the raw material to be fiberized molten glass.

## C. *Glass*

The basic element in fiberglass insulation is, of course, glass. Glass is made from a mixture of various minerals, of which silica is the major ingredient. The industry is constantly experimenting with different formulae to achieve the best combination of ingredients for glass fiberization. The ultimate goal is a molten glass which will meet quality standards and avoid such problems as devitrification or crystalization which would block the spinner; high viscosity which, since more heat is required, shortens spinner life, causes equipment failure and demands more in fuel consumption; and erosiveness, which causes the spinner's holes to enlarge rapidly, thus shortening their useful life.

Although only a peripheral issue in this suit, an inordinate amount of evidence was introduced on the subject of glass and its complexities. The Court sees no profit in any prolonged discussion regarding glass in these pages. However, the evidence does provide an example relating to the wholesale appropriation by defendant of J–M's processes and techniques, and influences the Court in its assessment of Faulkner's credibility.

The patent in suit discloses a formula (J–M's 862–C) for "softer glass" particularly appropriate to the process therein described. Subsequent research by J–M (at Faulkner's request) led to the development of another formula (# 901) which, with the addition of zinc oxide, provided improved fiber durability and resistance to deterioration under humid conditions. The new formula is disclosed in Patent 4,177,077.[9] The latter formula was developed by substantial research and by trial and error during the development of the HERM project by J–M and was well known to Faulkner. Guardian *began* its operation at Albion with a glass that is strikingly similar to J–M's # 901.

Faulkner testified that in starting defendant Albion's production he had intended to use the formula described in the patent in suit, but that he had inadvertently included zinc oxide ($ZO_2$) instead of potash ($K_2O$) in his formulation. It is not credible that Faulkner, with a doctorate in physics, over five years of intimate contact with the chemistry of molten fiberizable minerals and his direct involvement in the HERM project would "confuse" zinc oxide with potash. In fact, Faulkner had authored a report concerning HERM glass in which he used the chemical symbols of the formula in the patent in suit (Memo # PDCM99, March 20, 1974, Plaintiff's Exhibit 23) and, of course, the patent in suit, in which he was named as a co-inventor, discloses the formula he allegedly intended to use. Strangely zinc oxide is not included as an ingredient at all in that formula nor in his report.

It appears obvious to this Court that there was a knowing and deliberate appropriation of J–M's most current developmental work in glass formulation.

## IV. HERM DEVELOPMENT

The HERM development project was under the auspices of J–M's Project and Development staff. C. Donald Simmers headed the project development group responsible for rotary fiberization at the inception of the HERM project and reported directly to James S. Yonk. Yonk was production engineer of J–M's Fiberglass Division at the inception of the HERM project and, from 1972 to date, has been Director of Engineering for the Fiberglass Division. Both Simmers and Yonk were key witnesses for plaintiff concerning fiberization in general, as well as the specifics of HERM's development. Faulkner, who joined J–M in 1972, assumed onsite responsibility for the HERM team in 1975, reporting directly to Yonk until leaving J–M in October 1977.

### A. *The Invention of the Patent In Suit*

HERM had its genesis when Harvell Smith, who was assigned to S–X develop-

---

**9.** See U.S. Patent No. 4,177,077: glass composition for fiberization. Issued December 4, 1979;

Inventor: Lawrence V. Gagin; Assignee: Johns-Manville Corporation, at Col. 1, 11. 19–26.

ment, proposed using holes considerably smaller than 25 mils, the optimal size for the S–X process, so as to centrifuge directly fibers of less than 7 M and eliminate the need for external attenuation.

Smith's idea to use small holes to get small fibers, although apparently obvious to a lay person, was met with great skepticism by those skilled in the art. Simmers' previous experiments with that idea in 1969–70 had ended in failure when the molten glass refused to be centrifuged through holes that small, and the spinner "froze". Likewise an earlier patent teaches that mineral mixtures with a viscosity in excess of 40 to 45 poises [10] cannot be fiberized through small holes. The viscosity of glass at the optimal temperature for fiberization is in excess of 300 poises. See U.S. Patent No. 3,485,611 (hereinafter the "Blaze patent", after its inventor).

Nevertheless, Smith was permitted to experiment and succeeded in centrifuging the melt at 4000 rpm (revolutions per minute) through 12 mil holes to produce fibers of less than 7 M without the use of hot gas blast attenuation, as had been required with the S–X process. Smith's laboratory notes indicate that he experimented with the size of holes in the spinner, the number of holes and their configuration in rows, the number of revolutions per minute, the quantity of molten glass fed into the spinner per hour, i.e. "through-put", the viscosity and temperature of the glass and the temperature of the spinner itself (Exhibit 31, Smith's laboratory notes from November 1971 to April 1972).

Fiberizing glass through holes less than 25 mils worked because Smith drastically raised the spinner temperature and the rpm's so that the glass was more fluid and the increased centrifugal energy forced it through the smaller openings, which have one quarter the area of the holes in the

S–X spinner. Smith also greatly increased the number of holes so that the total area of orifice openings was the same as the S–X spinner, which has fewer larger holes, with the result that the rate of through-put was unreduced.

In December 1971, Smith was able to produce 5 M *continuous* glass fibers by centrifuging S–X formula glass through a disc with 41 rows of 12 mil laser pierced holes, with the disc heated to 1680° Fahrenheit by an internal burner and rotating at 3700 rpm. The glass was introduced at a through-put rate of 1100 lbs. per hour. The only problem with the fiber that Smith produced was that it was continuous and therefore unuseable for insulation; in the absence of the high velocity blast of the hot gas blast attenuation process, there was nothing to break the fibers into staple length for proper matting.

Smith eventually concluded that he lacked the educational and technical background to pursue his discovery further. He selected Duane Faulkner as his replacement because of Faulkner's educational background in physics (Ph.D.) and his technical skill derived in part from practical experience in other fields.

Duane Faulkner joined J–M's Product and Development team in June 1972 and proceeded to reduce Smith's empirical findings to a theoretical mathematical model which described the interrelationship among the parameters, and how the different variables could be controlled to produce consistently fibers of the desired diameter without the use of external hot gas blast attenuation as was required in the S–X process.

At the same time, Larry Howard was assigned the task of developing a method for breaking the continuous fibers into staple [11] length. Howard was the process and development technician responsible for assisting Smith and setting up the equipment for the latter's experimental work with 12

10. Poises is the measurement of viscosity, the greater the number of poises the more viscous the material.

11. Staple length is the term used to describe the desired length for commercial fiberglass insulation, i.e., 1″ more or less. Fiber diameter refers to the desired diameter of the fiber, i.e., 7 M or less, preferably 4 M to 5 M.

mil holes. Faulkner and Howard first tried to use an annular (completely around the circumference) air ring similar to one on the S–X system to deflect the attenuated fibers downward for collection. The annular air ring provided a continuous curtain of low pressure air, but did not break the fibers.

Howard then tried interspersing four jets of compressed air in the annular air ring below the spinner. Although the jets did break the fibers, they fused together and were unuseable as insulation. By late 1972, through experimentation, Howard concluded that the air jets needed to be closer to the spinner to prevent fusing, with multiple jets circumferentially spaced evenly around the single manifold of the air ring. With the jets operating at pressures of 30–35 psi (pounds per square inch), the fibers were broken or shredded as they passed through the column of air. Due to the placement and spacing between jets, "quiescent" zones are created. As a fiber is formed, it passes into the region of alternating air streams and quiescent zones. An individual fiber will grow under the influence of centrifugal force until it is broken off by an air jet and blown down for collection. After the hole from which the fiber was extruded passes the jet and enters the next quiescent zone, new fiber begins to grow. The streams from the air ring are ambient and low pressure so that no attenuation occurs other than that caused by the centrifugal force imparted by the rotating rotor. There is no hot gas blast attenuation in the stream.

Howard fabricated the first air ring himself, using ¼" pipe nipples rather than commercially fabricated jets in the fall of 1972. Early in 1973, he squashed some nipples as a forerunner to the "vee" jets ultimately used in combination with straight jets on the commercialized HERM spinner.

The development of the spinner with 12 mil holes, the theoretical model which explained the interrelationships of the various parameters necessary to sustain fiberization through such small holes, and the air ring forcing the fibers into staple length for insulation was just the first step in the long process to a commercial HERM line.

The spinner, formula and the air ring were the basis for J–M's patent application filed December 22, 1972, which ultimately matured into the patent in suit, U.S. Patent No. 4,058,386 issued November 15, 1977.

### B. Development of the Alleged Trade Secrets

The history of the entire HERM development process has been one of problem solving and refining the ancillary technology essential to successful commercialization of the method and apparatus disclosed in the patent application. The team discovered and solved problems in the areas of glass melting and transfer, spinner design and temperature maintenance, fiber breaking and collection. Duane Faulkner had direct oversight responsibility for all of the solutions and refinements. He was assisted chiefly by Schairer, Chenoweth, and Sanford, and had a support staff of technicians which included Limberg and Nishwitz.

The initial experiments in the HERM development program were hampered because it was required to use a producing S–X line. Eventually, however, the team was permitted to construct its own pilot line, which included an electric kettle melter, and the development proceeded more rapidly.

Earlier in 1971, J–M had purchased a Debusey-Pochet melter, which has been used for glass textile fibers, and refractory insulation fibers, but not glass insulation fibers. The electric kettle melter was slated to be operational by October 1, 1972. Once installed, however, it was necessary to adapt it to the needs of HERM fiberization.

PLEASE NOTE THAT PAGES 28 THROUGH 35 HAVE BEEN REMOVED FROM THE OPINION AND FILED SEPARATELY UNDER SEAL.

### V. GUARDIAN'S ENTRY INTO FIBERGLASS INSULATION

#### A. The Transfer of the HERM Team from J–M to Guardian

Reynold Nebel, a former J–M executive, invited Duane Faulkner to join Midland

Glass in the area of quality control and research and development, at a fiberglass installation in Shelbyville, Indiana, which Midland was attempting to acquire from Certainteed St. Gobain, an established fiberglass insulation competitor. Faulkner left J–M in October 1977, and was thereafter employed by Midland Glass for two months. Because Midland did not acquire the fiberglass plant in Shelbyville as anticipated, Duane Faulkner left its employ and joined Guardian Glass, again at the invitation of Reynold Nebel, who was then employed by Guardian.

At the time of the invitation, Guardian was not yet in the insulation business. Guardian had also bid unsuccessfully for the CSG plant at Shelbyville. In December 1977, Guardian acquired a rock wool plant in Huntington, Indiana, and Duane Faulkner joined Guardian, with an eye towards eventual entry into production of fiberglass when the opportunity presented itself. (Faulkner, Tr. 1502). At the same time Guardian hired Faulkner from Midland Glass, it also hired John Mikulak,[16] former plant manager of J–M's Richmond plant, the facility in which the HERM team worked, and John McCague, former Director of Production and Engineering Development at J–M until 1977. It appears that these four individuals—Nebel, Faulkner, Mikulak and McCague—left J–M as a unit intending to assist some company not yet involved in fiberglass insulation to enter that industry. When Midland Glass was unable to expand from the production of glass containers into the fiberglass business, the four person team, led by Reynold Nebel, picked the next most likely firm: Guardian Industries. (Sczesny, Tr. 3750).

James Schairer was the next former HERM team member to join Guardian. Schairer had written Faulkner an informal congratulatory note, dated September 29, 1977, in which he asked to be considered for a position in Faulkner's new venture, and followed this up with a formal letter of application, dated December 22, 1977, for the position of plant manager at Huntington. In January 1978, Schairer joined Guardian at its Huntington plant and helped bring the mineral wool line into production by May 1978. He began designing and acquiring equipment for the fiberglass line at Albion in February 1980.

Robert Nishwitz left J–M in April 1978 and worked for another employer prior to joining Guardian at its Huntington plant where he worked on project engineering from October 1978 to November 1979. Prior to Faulkner's departure from J–M in October 1977, Nishwitz had written Faulkner a letter suggesting that he would be interested in working with Faulkner again. Faulkner testified that he did not solicit the letter, but he did contact Nishwitz during his interim employment at J.C. Beasley between April and September of 1978 about doing design drafting for the Huntington mineral wool plant. Nishwitz transferred to the Albion site and, in November 1979, began conducting studies on plans and initial costs for the conversion of the Albion plant for fiberglass production. Nishwitz is currently a supervisor responsible for maintaining the production equipment at Albion.

Vaughn Charles Chenoweth stayed on with J–M's HERM team as an equipment operator until October 1978 when he joined Guardian at its rock wool plant in Huntington as process and quality control manager. In December 1977, Chenoweth had written Faulkner and asked to be considered for future job opportunities with his "new organization", i.e. Guardian, but he has no clear recollection of the actual sequence of solicitation of a job for hire with Guardian. According to Faulkner's testimony, however, Faulkner contacted Chenoweth in late 1978. (Tr. 3075). As early as March 1979, Chenoweth heard "talk" that Guardian was planning to enter fiberglass production. Although the record contains little about his specific responsibilities at Albion, he

---

**16.** Mikulak, initially a named defendant in this case, was dismissed from the suit by stipulation, prior to trial, on October 6, 1981.

was named as a co-inventor, along with Faulkner, on Guardian's patent application No. 226, 362, filed January 19, 1981. (Plaintiff's Exhibit 7). The application relating to a glass fiberizer was rejected September 4, 1981, and no patent has ever issued. This patent application was related to the subject matter of the invention disclosure Faulkner and Chenoweth proposed while at J–M on October 27, 1975, *supra.* (Plaintiff's Exhibit 70). By inference it appears, then, that Chenoweth assumed for Guardian duties similar to those he had performed at J–M.

Testimony reflects that Steven Sanford was initially contacted by James Schairer about possible employment with Guardian,[17] and thereafter Sanford followed up by seeking employment from Faulkner. Sanford left J–M's employ in February 1980. Although initially recruited to work at the Huntington plant to solve spinner motor mechanical problems, he was there only about a month before he transferred to Albion to assist with the mechanical design of the line and plant start up. Some prior mechanical designs, including the air ring, had been done by outside consultant, Nowicki, before Sanford joined Guardian in March 1980. (Tr. 4135). The actual operating air ring on the Albion line, however, conforms to designs done by Sanford, and is similar to that air ring which he designed

for J–M, indicating that Nowicki's designs were, at the very least, altered after Sanford joined Guardian. Sanford also designed, at Faulkner's direction, a melt furnace orifice, a tube trough, a spinner cover, and the exterior fuel air ring.[18]

Kenneth Limberg, who left J–M in October 1980 to join Guardian that same month, just in time for the start up of the Albion line, was the last named defendant to move from J–M to Guardian's fiberglass development team. Limberg had no role in the development at Albion, apparently because that work was completed for the most part prior to his advent at Guardian. He did discuss J–M's new 901 glass with Faulkner after joining Guardian. (Tr. 1490). He was also privy to information concerning J–M's development of a fuel air ring. (Tr. 1488). He was and still is employed in the capacity as production shift manager.

PLEASE NOTE THAT PAGES 40 THROUGH 50 HAVE BEEN REMOVED FROM THE OPINION AND FILED SEPARATELY UNDER SEAL.

## VI. THE PATENT ISSUES

Plaintiff has accused defendant of infringing claims 1 and 6 of U.S. Patent No. 4,058,386.[22] Defendant has denied that its

---

17. Defendants have introduced into evidence a letter dated January 21, 1978 from Sanford to Schairer for the purpose of proving that Sanford initiated the contact. Defendant's Exhibit AB–8. The Court, however, finds Sanford's direct testimony on the subject more persuasive. Tr. 3981.

18. Although Sanford denied any knowledge that J–M was developing a fuel air ring to replace fuel spillover, there was testimony and documenting evidence to the effect that such work was in progress when he left J–M, and that he was involved with it. Tr. 1488, and Plaintiff's Exhibit 172. The inconsistency casts doubt on Sanford's credibility as to this area.

22. 1. A method of producing staple fibers of finite length and having an average diameter of less than about 7 microns from molten mineral material comprising:
a. introducing said molten material at a rate of hundreds of pounds per hour into a rotating rotor internal of a peripheral wall of the

rotor, said peripheral wall containing orifices each having an initial diameter no greater than about 18 mils;
b. passing said molten material through said orifices to form primary fibers having an average diameter of less than about 7 microns without using hot gas blast attenuation,
c. forming around but spaced from said peripheral wall a series of streams of moving gas separated by a series of relatively quiescent zones,
d. moving said gas in said streams in a direction transverse to the direction of movement of said primary fibers, and
e. passing said primary fibers into said quiescent zones and into contact with said streams of moving gas, said gaseous streams having a temperature and velocity sufficient to break said primary fibers into staple fibers, but insufficient to cause any significant attenuation of said fibers.
6. In an apparatus for producing primary fibers having an average diameter of less than

method of manufacturing fiberglass infringes plaintiff's patent and has counterclaimed for a declaratory judgment that the patent is invalid for various reasons, detailed below.

A patent is a 17 year monopoly on an invention which meets three statutory standards for patentability: utility, 35 U.S.C. § 101; novelty, 35 U.S.C. § 102; and nonobviousness, 35 U.S.C. § 103. In return for the grant of exclusive use of the patented invention for 17 years, the inventor is obligated to disclose his claimed invention in sufficient detail so that the public at large may utilize the invention upon expiration of the patent.

The inventor is also obligated to disclose the best mode of implementing the invention. *See* 35 U.S.C. § 112. A court is unable to apply these standards to determine the validity of the patent in suit, without understanding the scope of the invention, what the inventor claims, and what the patent discloses. In patent law, the terms "claims" and "discloses" are words of art.

■■■ The claim is the bare specification of the invention found at the end of the patent. If the alleged infringer's apparatus, process or product "reads on", i.e. copies or duplicates, the claimed invention, "literal" infringement is established. *Hanson v. Alpine Valley Ski Area, Inc.*, 611 F.2d 156, 161 (6th Cir.1979). The balance of a patent is devoted to a detailed description of how the invention works. Utilization of information disclosed elsewhere in the patent, but not in the claims, does not give rise

to a claim for infringement as long as the accused device does not read on the claims.

### A. *File Wrapper Estoppel*

■■■ The extent of the claims cannot be determined from the four corners of the patent alone, however. Claims must be read in the context of the patent's file wrapper history, i.e. the steps the patentee pursued in the prosecution of the application.

> Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.

*Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966). This doctrine is known as file wrapper estoppel.

The prosecution of a patent involves give and take between the patent office examiner and the applicant. As the examiner rejects claims for not meeting the standards of utility, novelty or nonobviousness, or for shortcomings in setting forth the best mode, the applicant submits successive amendments, explanations and arguments to convince the examiner that the invention deserves patent protection. Claims and disclosures are modified to pass muster with the examiner. The doctrine of file wrapper estoppel prevents a patentee from later relying on what was surrendered to secure the patent.

> about 7 microns from a molten mineral material at a rate of hundreds of pounds per hour wherein the molten mineral material is introduced into a rotating rotor internal of a peripheral wall of the rotor and wherein said peripheral wall contains orifices each having an initial diameter no greater than 18 mils and wherein said molten material is passed through said orifices to form said primary fibers without using hot gas blast attenuation, the improvement comprising:
> a. means for breaking said primary fibers into staple fibers,
> b. said means comprising means for forming around but spaced from said peripheral

> wall a series of streams of moving gas separated by a series of quiescent zones, said streams having a temperature and velocity sufficient to break said primary fibers into staple fiber but insufficient to significantly attenuate said primary fibers, and
> c. said means directing said streams of moving gas in a direction transverse to the direction in which said primary fibers are formed so that said primary fibers enter into said quiescent zones and into contact with said streams of moving gas to be broken into staple fibers.

██ Normally file wrapper estoppel will prevent the patentee from enlarging the scope of his claim in an infringement suit to include an aspect of the invention which had been abandoned in an earlier claim and then asserting that the infringer's operation is equivalent. *Dollar Electric Co. v. Synderco*, 205 U.S.P.Q. 949, 961 (E.D.Mich. 1979) "[A]bandonment is established if a phrase used in an abandoned or rejected claim is not used in a later accepted claim." *Kaiser Industries Corp. v. McLouth Steel Corp.*, 400 F.2d 36, 55 (6th Cir.1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969).

██ File wrapper estoppel also applies in the opposite situation, where the patentee seeks to narrow the scope of what was claimed in the specifications to avoid a finding of obviousness. *See e.g., Dollar Electric, supra,* 205 U.S.P.Q. at 961. Where the patent office rejected the narrower claim and accepted the broader, the patentee is estopped from relying on the narrower, rejected claim when the patent's validity is challenged. In those circumstances, the underlying factual determinations are more difficult. *See Kaiser, supra,* 400 F.2d at 55. This latter type of file wrapper estoppel (narrow claim rejected; broader claim accepted) is instrumental in determining the effect of plaintiff's original disclosure of "a method for eliminating any conventional attenuating means", which was later changed to "a method and apparatus for eliminating hot gas blast attenuation". Assuming arguendo that the patent in suit is valid, whether it covers the elimination of all external attenuation or only hot gas blast attenuation is crucial to determining both the obviousness *vel non* of the patented invention and whether Guardian's fiberizing process infringed it.

### B. *The File Wrapper History*

J–M filed the parent application on December 12, 1972, No. 317,557.[23] J–M sought to patent Smith's fiberizer discovery for the production of continuous filaments as well as for the production of staple fibers for insulation. Successive versions of the original claims were rejected in light of the prior art and inadequate disclosure of how a large quantity of very small holes could function to centrifuge molten glass into fibers when previously such small holes had not worked. After multiple rejections, J–M abandoned the parent application.

██ J–M subsequently filed two continuation-in-part applications (hereinafter referred to as CIP) on January 27, 1975. A CIP is the original application plus new subject matter in the claims and specifications. The application relates back to the filing date of the parent application only as to those matters within the original application. New matters are covered under the CIP's more recent filing date. J–M's CIP 544,097 claimed only a method and apparatus for the production of staple fibers, not continuous filaments.[24]

The wording of the specifications in the above application varies little from the final version of the patent in suit. Plaintiff disclosed the fiberizer with less than 18 mil holes, the theoretical model of the process

---

**23.** Although the patent in suit was issued in the name of its three inventors, Smith, Faulkner and Howard, the application was prosecuted by J–M's patent department for J–M's benefit. All three members had previously executed employment agreements which recited that "any and all inventions, discoveries or developments ... relating to ... Johns Manville Corporation" became its property. *See, e.g.,* Duane Faulkner's Employment Agreement, June 1, 1972, Plaintiff's Exhibit 87.

**24.** On the same date that J–M filed CIP 544,097 (Plaintiff's Exhibit 4), J–M also filed CIP 544,094 (Plaintiff's Exhibit 3). In this latter, plaintiff

only disclosed and claimed Smith's fiberizer and Faulkner's theoretical model with its parameters, omitting any mention of the air jets, or any other means for breaking the fiber into staple lengths. Plaintiff instead sought to patent a method and apparatus to make continuous or long filaments to form ropes, etc. All claims were finally rejected for obviousness on May 11, 1976. J–M's motion for reconsideration was denied and the application was abandoned. Plaintiff then filed Continuation No. 734,498 on October 21, 1976. All claims were rejected. Plaintiff appealed, but the examiner's rejection was affirmed, and the application abandoned.

which explained the interrelations of the parameters, and the air ring for breaking the fibers, and initially claimed all three elements.

After continued difficulty in persuading the examiner, J–M filed Continuation 725,-072 on September 20, 1976, which was a continuation application of No. 544,097, and ultimately matured into the patent in suit. The abstract and specifications were virtually unchanged. J–M's claims were virtually those accepted and then abandoned in CIP 544,097, which included claims for the theoretical model and parameter manipulation.

Plaintiff subsequently cancelled, without prejudice, all those claims (Plaintiff's Exhibit, p. 60) and added by amendment claims similar to those found in the patent in suit with two variations: (1) J–M claimed the use of a "fluid" stream for breaking fibers where the patent in suit claims a "gas" stream; and (2) J–M omitted the claim of a *series* of quiescent zones from the continuation's claim 28. All claims were rejected.

Subsequently, plaintiff renumbered the claims to the present state, replaced the word "fluid" throughout the claims with "gas", and again answered the examiner's concern of obviousness in light of the prior art. All claims were subsequently allowed, and the patent in suit issued in its present form on November 15, 1977.

■■■■■ J–M's applications included both independent and dependent claims. An independent claim stands on its own without any reference to any preceding claims. In the patent in suit, claims 1 and 6 are independent. A dependent claim incorporates by reference the prior independent claim, as well as claiming additional details. In the patent in suit claims, 2–5 and 7–10 are dependent.

While the claim of the parent application and the patent in suit are, as can be expected, basically similar, substantial refinement and concessions were required to be made. The chief distinction between the parent application and the patent in suit is that the latter claims only a method and apparatus for producing less than 7 micron *staple* fibers without hot gas blast attenuation, and omits any reference to *continuous* filament production. Nor does the patent in suit *claim* the theoretical model with its interrelated parameters, although the patent does *disclose* it. But the critical distinction for determining the infringement question is the transition from the parent application's claim that the fibers are formed without *any external attenuation* to the patent in suit's claim that the method operates without *hot gas blast attenuation.*

When J–M focused on eliminating *all* external attenuation in the production of continuous filaments, the patent application was rejected.[25] When J–M focused only on eliminating hot gas blast attenuation in the production of staple fibers, however, the patent was granted.[26] The net effect of the examiner's acceptance of the latter and rejection of the former is that any fiberizing method which uses a rotor with holes less than 18 mils to form staple fibers less than 7 M infringes the patent in suit even though an additional external attenuation method is used, unless that method is hot gas blast attenuation.

■■■■ The patent claims relating to the air ring developed under the same give and take procedure. The examiner rejected as obvious that portion of the claim concerning breaking streams until J–M amended the claim to state that the streams were separated by "relatively quiescent zones". Having thus narrowed its description of the air ring to secure the patent, J–M is estopped from claiming that a process that uses an air ring *without* quiescent zones infringes the patent.

25. See parent application No. 317,557 (Plaintiff's Exhibit 2), pp. 3, 7, and Claim 1, pp. 40, 46, 50–51, 99, and 118; Continuation in Part 544,-094 (Plaintiff's Exhibit 3) and Continuation 734,-498 (Plaintiff's Exhibit 6), pp. 46, 52, 58, 61–64, and 101.

26. See Continuation in Part 544,097 (Plaintiff's Exhibit 4), pp. 53, 54, and 62.

**1054**

In sum, according to classic file wrapper estoppel, due to various changes in claims and disclosures during the prosecution of the patent, J–M is also estopped from claiming (1) that its invention covers continuous filaments as well as staple length fibers; (2) that use of Faulkner's model and parameters is an infringement of the patent; (3) that the air ring operates with a continuous stream of air (and the absence of quiescent zones); and (4) that the breaker streams may consist of "fluids", because the patent in suit reduced its claim to cover only "gas".

J–M is entitled, however, to claim any process which directly centrifuges fibers less than 7 M in average diameter through holes 18 mils or smaller, as long as it does not use hot gas blast attenuation after extrusion. In this instance, file wrapper estoppel works to allow a broader claim because the narrower was originally rejected. "The claims that were finally allowed were broader than if the omitted claim had been included." *Kaiser Industries Corp. v. McLouth Steel Corp.*, 400 F.2d 36, 55 (6th Cir.1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969).

### C. *Validity*

Defendant raises multiple defenses to plaintiff's claim of patent infringement, with two main themes: (1) the patent is invalid, and (2) even if the patent were valid, defendant's production methods and apparatus at Albion do not infringe. If plaintiff's patent is found to be invalid, there is no need to reach the question of infringement. *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 622 (6th Cir.1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979).

To be valid, a patent must be useful, novel and nonobvious. In evaluating whether these criteria are met, the Court must bear in mind that a patent has issued, and therefore carries a presumption of validity. *American Seating, supra*, at 615. The accused infringer may, of course, rebut that presumption, but in the case at bar defendant has failed to do so. The record as a whole supports the validity of the

patent in suit, for the reasons set forth below.

### 1. *Utility*

Defendant does not contest the utility of the patent. Indeed defendant's unsuccessful attempt to secure a patent on a modification of the patent in suit adds weight to the validity of the challenged patent. *See Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 269 (2d Cir.1967). Because the burden of proof of invalidity for any reason is on the defendant, *Eltra Corp. v. Basic Inc.*, 599 F.2d 745, 750 (6th Cir.1979), and Guardian has failed to prove the invention's inutility, the invention of the patent in suit is deemed useful, under the standards of 35 U.S.C. § 101.

### 2. *Novelty*

An invention lacks novelty and is therefore unpatentable "only where the invention was identically disclosed in the prior art". *Ling-Temco-Vought, supra*, at 267. *See also, American Seating, supra*, 586 F.2d at 618. An invention is not novel if it was anticipated by the prior art; however, "[t]he standards of anticipation are strict. The invention must be disclosed within the four corners of a single reference." *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 349 F.Supp. 345, 356, *modified*, 351 F.Supp. 872 (N.D. Ohio 1972), *modified*, 489 F.2d 1105 (6th Cir.1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974).

Guardian makes a convoluted two-step argument that J–M's invention lacks novelty. Defendant cites its rejected patent application No. 226,362, which covers essentially the same method of fiberizing as the patent in suit, and asserts it was rejected for lack of novelty. Defendant then asserts that since defendant's method lacks novelty, if it is found to infringe the patent in suit, it has established that J–M's invention also lacks novelty. A review of the file wrapper of Guardian's rejected application (plaintiff's exhibit 7) demonstrates

that rejection was due to its obviousness, not lack of novelty. (Plaintiff's Exhibit 7 at document number 401223). Because defendant's argument is based on an erroneous assumption, the entire argument must fail. Defendant has cited no prior art which reveals all elements of plaintiff's invention in a single patent, and therefore the Court must conclude that the invention is novel.

### 3. *Obviousness*

The crucial standard, and the most difficult to apply, is obviousness. 35 U.S.C. § 103.[27] "Essentially nonobviousness is the statutory equivalent of the requirement of invention", derived from the Supreme Court's decision in *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851); *Eltra Corp., supra*, 599 F.2d at 751.

The leading case construing the obviousness test in § 103 is *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), wherein the Supreme Court stated:

> While the ultimate question of patent validity is one of law, *Great A. & P. Tea Co. v. Supermarket Corp., supra*, at 155 [71 S.Ct. [127] at 131] [340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950)], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others,

etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. *Graham v. John Deere Co., supra* at 17–18, 86 S.Ct. at 694.

[3] This Circuit has developed a three-step method of determining whether a patent is invalid for obviousness: 1) a factual determination of the prior art; 2) a factual determination of what improvement the patentee has made over the prior art; and 3) a legal determination of whether the improvement would have been obvious to one skilled in the art. *Westwood Chemical, Inc. v. Owens-Corning Fiberglas Corp.*, 445 F.2d 911, 914 (6th Cir.1971), *cert. denied*, 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972); *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 411 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

*Lucerne Products, Inc. v. Cutler-Hammer, Inc.*, 568 F.2d 784, 796 (6th Cir.1977).

### a. *Prior Art Generally*

### i. *Scope*

The review of the contents of the pertinent prior art is tedious and determining its scope can be difficult. "[T]he prior art that is relevant in evaluating a claim of obviousness is defined by the nature of the problem confronting the would be inventor." *Smith v. Acme General Corp.*, 614 F.2d 1086, 1093 fn. 11 (6th Cir.1980), *citing, Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963 (7th Cir.1979). From the sum of J–M's argument, the Court infers that J–M interprets the scope of the prior art to include all patents on the topic of *rotary fiberization*. Defendant, on the other hand, clearly defines its interpreta-

27. 35 U.S.C. § 103 states:
 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

tion of the scope to include *fiber formation from molten mineral material* without regard to the presence or absence of a rotary process. The patent examiner elected to be guided by a patent which discloses the rotary fiberization of a viscous ceramic solution (albeit not molten) through 20 mil holes to form fibers within the same M range as the patent in suit. U.S. Patent No. 3,485,611 issued to Blaze, December 23, 1969 (hereinafter referred to as "Blaze"). The Blaze patent teaches the difficulty of fiberizing material with a viscosity of more than 40–45 poises through holes less than 20 mils, and the patent examiner relied on its teaching in rejecting J–M's application regarding continuous filaments.

The problem that J–M's inventors solved was how to form fibers by centrifuging a viscous material through very small holes, and breaking it into staple length fibers. The scope of the art as defendant would have the Court define it would exclude the Blaze patent and its negative teaching because it deals with the fiberization of a viscous ceramic solution, which is not a form of molten minerals. Clearly those skilled in the art were familiar with the teaching that materials with the viscosity of molten glass—in excess of 300 poises—could not be fiberized through a rotating spinner, and Blaze is one source of that teaching. The scope of the prior art on which the patent office and the Court must rely in those patents which deal with rotary fiberization, including mechanisms for breaking fiber so formed.

ii. *Content of the Prior Art*

■■■ Although infringement is measured against a patent's claims, obviousness is measured against everything disclosed in the prior art. Thus a reference to something in the specifications of relevant patents, which is only tangentially related to the matter of the challenged patent and its disclosures, may be held up as prior art which renders a subsequent patent invalid. "[E]ven unworkable devices form a part of the teachings of the prior art." *Smith v. Acme General Corporation, supra,* 614 F.2d at 1093. Nevertheless, the dormancy of a prior art patent as compared with a subsequent patent's success provides some support for the validity of the subsequent patent. *See Ling-Temco-Vought, Inc., supra,* 372 F.2d at 267, *citing, Trabon Engineering Corp. v. Dirkes,* 136 F.2d 24 (6th Cir.1943) (decided prior to codification of judicial test of inventiveness).

■■■ In making a determination of obviousness from the prior art, "known disadvantages in old devices which would naturally discourage the search for new inventions may be taken into account...." *U.S. v. Adams,* 383 U.S. 39, 52, 86 S.Ct. 708, 714, 15 L.Ed.2d 572 (1966). Other factors include the experts' disbelief as to the feasibility of the claimed invention, and a "crowded art", i.e. one in which exist many patents, which do not mention the claimed invention. *Id.*

The patent in suit includes claims concerning both the formation and the breaking of the fiber. The patent office considered two separate bodies of art during the prosecution. For the sake of clarity, the Court adopts the same approach.[28] In addition, defendant also cites as pertinent prior art some patents which the patent office failed to consider. The Court has reviewed those submissions, aware that such an oversight weakens a patent's presumption of validity. *See e.g., Hanson v. Alpine Valley Ski, Inc.,* 611 F.2d 156, 159 (6th Cir.1979).

The Court's review of the prior art has focused on those aspects of the invention that plaintiff has set forth as differentiating it from the prior art of rotary fiberization:

---

**28.** Both parties submitted extensive collections of patents in support of both the patent and trade secret claims (*e.g.,* Plaintiff's Exhibit 9–A includes 65 patents). The Court has basically limited its examination to those cited in post-trial briefs or relied on by the patent office. In light of the detailed and thorough-going post-trial submissions by counsel for both sides, the Court is confident that the pertinent references have been brought to its attention.

1. The use of holes originally less than 18 mils.

2. More than 40,000 holes in the rotor.

3. A mathematical model for adjusting parameters to ensure continued flow of the glass through the small holes.

4. Direct fiberization of fibers less than 7 M in diameter without using hot gas blast attenuation.

5. The use of discrete air streams to break the fibers.

b. *Prior Art: Fiberizers*

*Carpentier*

3,304,164 February 14, 1967

Plaintiff's Exhibit 9A, Tab VV

The chief teaching of this patent is a combustion chamber which surrounds the rotor and produces hot gas blast attenuation. The patent also teaches the rotary centrifuging of glass (viscosity 2,500–3,000 poises) through a large number of 36–44 mil holes arranged in 20 rows. However, the holes referenced are much larger than 18 mils and thus require the use of hot gas blast attenuation, both of which distinguish it from the patent in suit.

The patent also discloses a curtain of downward streams, essential to hot gas blast attenuation, but not necessary to break the fibers. The patent does not mention the diameter of either primary or attenuated fibers.

*Maddox*

3,374,075 October 7, 1965

Plaintiff's Exhibit 9A, Tab DDD

This patent, which employs rotary fiberization and hot gas blast attenuation, chiefly teaches an adjustable rotor shaft to compensate for rotor warpage which is caused by the hot glass, and can alter the distance between the rotor wall and hot gas blast attenuation zone to ensure uniform fibers.

The patent teaches the use of 3,000 cubic feet of gas per 1,000 pounds of glass in contrast to the patent in suit which uses 300 cubic feet per 1,000 pounds. The patent does not teach hole or fiber size.

*Brossard*

3,650,716 March 21, 1972

Plaintiff's Exhibit 9A, Tab JJJ

This patent teaches the formation of primary fibers by forcing molten thermoplastics, especially glass, through holes in the bottom of a round disc by centrifugal force and a downward blast of compressed gas *within* the rotor periphery. The patent notes that, if there are any holes in the side wall, there should be only one row whose holes, or slots, may be 3 millimeters wide and up to 30 millimeters long—far larger than the holes of the patent in suit. The patent suggests the use of hot gas blast attenuation or high pressure blasts in streams transverse to fiber flow, but there is no indication that these streams would function to break fibers or produce less than 7 M fibers, even if used with either the *Maddox* or *Charpentier* rotors. The patent is silent as to the size fiber it produces. The patent office cited this patent against both the fiberizer and the air ring.

*Kleist*

3,523,774 August 11, 1970

OCF Plaintiff's Exhibit 9B, Tab Q

This patent teaches a spinner 12″ or more in diameter with 10,000 holes for centrifuging glass fibers at high speed into a zone of hot gas blast attenuation. The patent examiner relied on the large number of holes in finding the patent in suit obvious initially because more holes permit a greater through-put.

The patent teaches a heating method which keeps the glass hot longer to enhance attenuation and permits reduction of the pressure of the attenuating blast of steam disclosed at 100 psi or more.

Significantly, the patent teaches that its method would reduce the turbulence which otherwise *impedes* attenuation external to the rotor. This teaching rebuts Faulkner's testimony that Guardian's process does not infringe the patent in suit because its turbulent flame zone *enhances* attenuation.

*Warkoczewski*

3,511,306 May 12, 1970

Plaintiff's Exhibit 9A, Tab HHH

This patent teaches a method for casting rotors with an improved hole interior to reduce wear. Molten glass at high temperatures is erosive and enlarges the hole size in ordinary metal rotors, destroying fiber uniformity. The patent examiner focused on the patent's disclosure of orifices 10–30 mils in size which produce 4 to 10 M fibers, and found that rendered the proposed fiberizer obvious, but ignored the fact that the patent also disclosed the need for hot gas blast attenuation. Although the patent notes the platinum lining of the rotor prevents hole size change, it never states a range of hole sizes. Because the patent in suit relies on the laser drilling of thousands of holes in an alloy rotor, the chief teaching of the patent bears little relevance to the patent in suit.

In prosecuting the parent application, J–M cited two additional patents to buttress its claims that the fiberizing process was not obvious.

*Levecque*

Canadian Patent No. 731,050

This patent teaches spaced attenuation burners to prevent the clumping of centrifuged fibers and to allow room around the burners for reduction of air, thus reducing turbulence. This is distinguishable from the discrete air streams for fiber breaking which the patent in suit teaches. The patent also disclosed a rotor with 2 to 20 holes, in contrast with the patent in suit's 40,000 holes, and requires the use of hot gas blast attenuation.

*Knoblauch*

German Patent 571,807 March 6, 1933

Plaintiff's Exhibit 9B, Tab C

This patent teaches the use of hot gas blast attenuation as opposed to drum attenuation, which consists of attaching primaries to a drum and stretching by winding around the drum, after the fibers have been formed by centrifuging.

The patent examiner relied on the foregoing prior art to conclude that both the fiberizer and air ring claimed in the parent application were obvious, even though ev-

ery patent called for hot gas blast attenuation after the primary was formed to produce appropriate diameter fibers.

After the patent office's rejection of the parent application, J–M filed two continuations in part. The patent office cited the following prior art in accepting the claims of 544,097 and rejecting those of 544,094—the fiberizer above.

*Periat*

3,841,854 October 15, 1974

Plaintiff's Exhibit 9A, Tab McMcMc

This patent discloses a device to heat the interior periphery of the rotor without using a gas rich mixture that creates secondary combustion outside the walls and the turbulence which is deleterious to hot gas blast attenuation. Although the patent does refer to a plurality of tiny orifices, commenting that when clogged no fibers are formed, neither the hole size nor fiber size is mentioned. The need for the invention assumes hot gas blast attenuation is essential to fiber formation. The patent permits the inference that fuel rich spillover was a liability, not an asset to rotary processes prior to HERM.

The patent office again cited to *Warkoczewski, supra.*

*Stalego*

3,357,807 December 16, 1967

Plaintiff's Exhibit 94, Tab BBB (OCF)

This patent, entitled a Method and Apparatus for Forming Continuous Filaments, was cited by the examiner as disabling prior art against both CIP '097 and '094, and prevented the latter from maturing into a patent.

The patent discloses centrifuging glass into "fine continuous filaments", although the fiber diameter is never specified. J–M adequately rebuts the examiner's assumption that "fine" implies less than 7 M to one skilled in the art, with its explanation that the product is reinforcing filaments known in the art to range from 11–17 M and would not include insulation fibers less than 7 M. From the specifications, the Court infers that once formed, the fibers were attenuated either by mechanical

means or by hot gas blast attenuation. The patent is silent as regards rotor hole size, although the Court infers from the presence of tens of holes, rather than tens of thousands, that each hole exceeds 20 mils, the maximum size of the patent in suit.

Although the patent disclosed a hood that surrounds the rotor with ducts, connected to compressed air, the stream is used only for collecting fibers. If it also functioned to break them, it would defeat the purpose of the invention, the formation of *continuous* filaments.

*Blaze*

3,485,611 December 23, 1969

Plaintiff's Exhibit 9A, Tab FFF

This patent, discussed earlier in determining the scope of the art, *supra*, teaches fiberizing viscous, as opposed to molten, mineral material. Although originally cited because it teaches the formation of 5 M fibers through holes about 20 mils, which would tend to render the patent in suit obvious, it also teaches that material with a viscosity in excess of 45 poises will not fiberize because the small holes of the rotor will clog. This latter teaching would tend to discourage the use of small holes with molten glass whose viscosity exceeds 300 poises and makes the patent in suit's invention *less*, not more, obvious.

*Weck*

3,503,726 March 31, 1970

Plaintiff's Exhibit 9A, Tab GGG

The chief teaching of this patent is a divider for more efficient spreading of glass stream into a rotor whose shaft is tilted at approximately 45° from vertical. Although the patent mentions a spinner that is 11½″ in diameter, with 10,000 orifices on a 1½″ high peripheral wall at 2,500 rpm, the hole size, 25–30 mils, indicates that further external attenuation would be necessary to produce staple fiber. The patent is silent, however, as to attenuation methods or fiber size.

*Thomas*

2,192,944 March 12, 1940

This patent is relatively old in the prior art, the invention having been made in 1937. Although the patent discloses a means for direct formation of fibers as fine as 3–4 M without any further attenuation, the patent discloses the use of nipples, rather than holes, and is silent as to their diameter. The prior art as a whole, however, supports the inference that the nipples were larger than the 18 mil size essential to centrifuge less than 7 M fibers.

The patent focuses on formation of continuous fibers and how to avoid the formation of a crown of tangled fibers, a common problem in producing filaments. Notwithstanding that the invention has never been implemented and is not workable as claimed or disclosed, the patent examiner relied on it for rejecting plaintiff's application for a patent on rotary fiberization alone.

■ In sum, the prior art of fiberizers teaches holes larger than 20 mils and assumes the use of some external means of attenuation, in most instances, hot gas blast attenuation. Only one patent purports to teach fiberization of staple insulation fibers without hot gas blast attenuation, and its teachings, up until the time of plaintiff's invention, had been deemed unworkable. An early patent's dormancy and subsequent success of a later patent with similar teachings buttresses a finding of nonobviousness. *Ling-Temco-Vought, Inc., supra,* 372 F.2d at 267.

c. *Prior Art: Air Rings*

*Brossard*

3,650,716 *supra*

Neither Brossard's blast of air within the rotor to form the primaries, nor its use of steam blast transverse to the fiber at the periphery, have any bearing on the discrete air streams of the patent in suit.

*Blaze*

3,485,611 *supra*

This patent teaches a gaseous blast from a series of outlets to "provide a gentle diffused air stream which moves upwards and lifts formed fibers from the openings".

(Column 2, line 50). The patent contains nothing which would render obvious the discrete downward streams for breaking fiber of the patent in suit.

*Peyches*

French 983,921 June 29, 1951

Plaintiff's Exhibit 9B, Tab B

This patent discloses the problem of a tangled crown of fibers when centrifuging continuous fibers, and suggests placing a single obstacle in the path of the newly formed fibers. From the English translation, the Court infers that reference to the gathering of fibers to form a "felt" implies fiberglass insulation, which makes the patent most pertinent.

Most embodiments of the invention consist of a solid object as an obstacle, some of which have holes and a negative pressure to collect the newly formed fibers by suction, or to roll them onto a drum to attenuate the fibers further. Although the patent does not *claim* that an obstacle may be *a* jet of compressed gas, it does *disclose* it. The patent does not, however, teach the use of more than one obstacle.

*(Inventor Illegible)*

French 41,923 October 10, 1944

Plaintiff's Exhibit B-A

This patent teaches the use of blades of air to intercept newly centrifuged fibers, to break them in a stream of air, and blow them away for collection.

If any two patents could result in the finding that the patent in suit is invalid for obviousness, it is these French patents, both of which teach the use of a jet to break fibers in one place. The only distinction between them and the patent in suit is that the latter claims multiple jets spaced so as to leave quiescent zones between the nozzles.

Nevertheless, the patent examiners had these two patents before them when the patent in suit issued. The file wrapper history reflects greater concern with distinguishing the blower device of *Brossard* (column 2, line 65) than the single jets of the French patents. The patent issued after plaintiff persuaded the examiner that the continuous air ring of *Brossard* was distinct from the patent's discrete streams. Thus, if these represent the best prior art, the presumption of validity is strengthened. *See e.g., Hanson v. Alpine Valley Ski Area, Inc.,* 611 F.2d 156, 159 (6th Cir. 1979).

Defendant contends that the patent office has not considered the most pertinent prior art and proffers two other patents which, it claims, render obvious the patent in suit's use of an air ring for breaking fibers.

*Nystrom*

German 1,999,431 August 26, 1965

This patent, for the production of rock wool insulation from slag, teaches a vertical rotor which implicates a shot propulsion, rather than rotary process, and a new type of air ring for the production of a high velocity gas blast. (The English translation in evidence does not use the "magic words" hot gas blast attenuation).

Although the patent discloses evenly spaced nozzles of different shapes around an air ring which surrounds a rotor, the purpose of the discrete streams of high temperature air at 200–800 meters/second is to create spaces of lower pressure which will assist with drawing the melt streams into the attenuating blast. The invention is an improvement over a continuous blast curtain which tends to resist the entry of melt streams into the high temperature, high velocity blast—the hallmark of the hot gas blast attenuation. The teachings of this patent bear no relation to the lower temperature, low velocity spaced streams of the patent in suit for breaking fibers into staple lengths.

*Peyches*

2,629,969 March 3, 1953

Defendant's Exhibit 2

The teachings of this patent are strikingly similar to those of Peyches' French patent No. 983,921 considered by the patent office and discussed *supra.* A close examination of filing dates, and the similarities of language (although they are not identical due to the vagaries of French to Eng-

lish translation) impels this Court to conclude that defendant's "overlooked" patent is merely the United States version of the French patent which the examiner had before it when he granted the patent in suit. The presence of the most pertinent prior art, whether the French or English patent of the same invention, strengthens the presumption of validity, and vitiates defendant's argument.

**d. *Jepson Format as Prior Art***

Defendants also urge that the construction of plaintiff's claim 6 is in the "Jepson format" so that certain language of the claim constitutes an implied admission of disabling prior art, which, on its very face, renders the patent invalid for obviousness. Because the Court finds the Jepson-format rule does not apply to this patent, nothing in the patent constitutes an admission that the invention is obvious.

The "Jepson-format", codified in 37 C.F.R. § 1.75, permits patent claims to contain a preamble, the contents of which are not included as part of the patentable invention which is set forth in the same claim immediately following the preamble. The Jepson-format can be recognized by a preliminary description which concludes with a semi-colon followed by the phrase—"the improvement comprising..."

Defendant asserts that since claim 6 uses the language "... the improvement comprising...", it constitutes an admission of prior art.

Claim 6, however, is an *apparatus* claim, while the preamble language is drawn from independent claim 1, and dependent claims 2–5, which are *process* claims. Here the alleged Jepson-format is merely a shorthand method of restating the invention of claim 1, not an admission that the invention constitutes prior art. The patent's unhappy phrasing of "the improvement comprising", rather than the non-Jepson-format language, "the apparatus comprising" is not an error of sufficient magnitude to

deprive plaintiff of the benefits of its duly granted patent.

■■■ "[A] finding of obviousness should not be based on an implied admission erroneously creating imaginary prior art. That is not the intent of § 103. We will not use appellants' claim preamble as prior art against them in this situation." *Application of Ehrreich*, 590 F.2d 902, 910 (C.C.P.A.1979). The preamble to claim 6 contains no admission of prior art that would render plaintiff's invention obvious.

**e. *The Level of Skill in the Art***

The inventors of the patent in suit, the HERM development cadre, and J–M's project and development staff all possess a high degree of competence in a technically complex field—the production of fiberglass insulation—whether gained through formal education or on the job training. Faulkner has a Ph.D. in physics; Howard, an associate's degree in mechanical engineering; and Smith, 13 years work experience with J–M to compensate for his primarily liberal arts background in philosophy and sociology.

Other patentees in the field of fiberglass include Gagin, with a B.S. in ceramics engineering and 35 years of experience, and Simmers, with a B.S. in science, a minor in chemical engineering and 35 years of experience. Defendant Chenoweth has a B.S. in mathematics with some graduate courses in electrical engineering, and both Schairer and Sanford have post high school training in technical or engineering subjects.

Based on this record, and the nature of the art itself, as revealed in the submitted patents and related literature, such as manuals and reports, the Court finds that the level of skill in the art is high, and that the invention and innovations involved herein are not of the type susceptible of discovery by the average lay person without technical training or experience.[29]

**29.** The Court does not feel competent to explain why Smith, with no training or experience, a layman in the full sense, had the temerity and persistence to conceive and implement the idea of the fiberizer at issue. That explanation, too, should probably be left to experts.

### f. Conclusions Regarding Obviousness

■ The standard that the Court must apply in determining "obviousness" is whether "the improvement is the work of the skillful mechanic, not that of the inventor." *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 279, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976), *quoting Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851).

■ The Court must not "consider a reference in a vacuum, but against the background of other references of record which may disprove theories and speculations in the reference, or reveal previously undiscovered or unappreciated problems. The question in a § 103 case is what the references would *collectively suggest* to one of ordinary skill in the art." *Application of Ehrreich*, 590 F.2d 902, 908–09 (C.C.P.A.1979) (reversing patent office's rejection of plaintiff's patent as obvious).

Defendants have sought to prove obviousness by fragmenting the prior art rather than reviewing it collectively as is required. In their proposed findings of fact, defendants have cited to testimony of both Faulkner and Yonk to the effect that elements of the patent in suit are obvious.

Defendant Faulkner's testimony as to the obviousness of the fiber forming and cutting techniques came only after a protracted series of questions which the Court found to be repetitive. The Court finds Faulkner's testimony as to obviousness to be self-serving and in total conflict with his conduct as a named inventor on the patent and in subsequent HERM development work. Where the credibility of·a witness is questionable, his actions speak louder than his words.

Likewise, the context of Mr. Yonk's "admission" of the obviousness of smaller holes to get smaller fibers diminishes the alleged effect of his testimony. The answer was given in the context of admission of hole size, and amount of wear which enlarges the holes, and does not persuade the Court that the fiberizer of the patent was obvious. See Yonk testimony, Tr. 535, 536, October 22, 1981.

■ After reviewing the prior art as a whole, including the unworkable Thomas patent for direct centrifuging, and *Blaze's* warning that material with the viscosity of molten glass will plug rotor holes which are 18 mils or less, the Court concludes that J–M's fiberizing concept was not obvious, as long as the focus remains on production of fibers suitable for insulation is less than 7 M in diameter. Nor does the Court find the use of multiple discrete streams of low pressure, low temperature air for breaking fibers to be obvious.

Because, however, the patent office found formation of *continuous* fibers using the method of the patent in suit to be obvious and unpatentable, J–M's patent may well be considered a combination patent of fiberizing method and apparatus, on the one hand, and the breaking air ring on the other. Thus it is necessary to consider the standards for combination patents. The Court does not imply agreement with the early conclusions of the patent office, nor that the '386 patent is a combination patent. For example, a perusal of the prior art patents demonstrate that the production, length and diameter of insulation fibers are treated frequently as a distinct and separate field, undoubtedly due to the acceptance of the principle that to perform their function, insulation fibers must have certain configurations. Thus fiberization *per se* and preparation for eventual insulation use are so inextricably intertwined as to constitute traditionally a single process. However, in the interests of avoiding any potential for further argument and litigation, the Court will address the issue of combination.

### 4. Combination or Aggregation

■ Defendants challenge the validity of the patent on the ground that it is merely an aggregation of two independent inventions: (1) the method for centrifuging fibers less than 7 M without hot gas blast attenuation, and (2) an air ring with alternating nozzles and quiescent zones for use in breaking the fibers into staple lengths.

Defendants urge that their two inventions were not patentable independently and that, because there is no coaction between them, they should not be patented together.[30]

An inquiry into the law of combination patents begins with *A & P Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The Supreme Court stated:

> [T]he key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. In course of time the profession came to employ the term "combination" to imply its presence and the term "aggregation" to signify its absence... The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.

340 U.S. at 150-51, 152, 71 S.Ct. at 129, 130. The Court also noted the difficulty and improbability of finding invention in an assembly of old elements.

"[A] combination of old elements would be patentable if it performed a new function." *Shatterproof Glass Corp. v. Guardian Glass Co.*, 462 F.2d 1115, 1123 (6th Cir.1972). Likewise, the Sixth Circuit quoted approvingly:

> Given that the individual claim elements are old and disclosed in the prior art, if this device is to be patentable then there must be that "impalpable something," *Harvey v. Levine*, 322 F.2d 481, 485 (6th Cir.1963), in the combination itself that would render the invention unobvious.

*Reynolds Metal Co. v. Acorn Building Components, Inc.*, 548 F.2d 155, 161 (6th Cir.1977), *quoting Philips Industries, Inc. v. State Stove & Mfg. Co., Inc.*, 522 F.2d 1137, 1141 (6th Cir.1975).

In arguing that there is no coaction between the air ring and the fiberizing process, defendants rely heavily on the fact that plaintiff tried to patent the fiberizing process alone without the air ring. The object of that invention was the formation of long continuous fibers; the object of the patent in suit is the production of staple fibers for use in insulation. With that specialized end product as the goal, neither part of the combination is useful on its own, both must work together.

Defendants went to great lengths to establish that there was no coaction between the forming and the cutting, to no avail. Howard's testimony confirms that the position of the air ring relative to the periphery of the spinner affected fiber quality. (Tr. 776-78). J-M later included this information in its operating manual. (HERM Operating Manual, Plaintiff's Exhibit 26, p. 141, 145, 148, 150). Reflection confirms this: where fiber attenuation is dependent on maintaining plasticity, and breaking is accomplished by the use of ambient temperature streams, which also prevent fusing of the newly formed plastic fibers by cooling them, there is a delicate interplay between the two temperature requirements. Clearly the action of the breaking streams affects fiberization.

As long as fibers were produced which required additional hot gas blast attenuation, there was no need for separate means to break them into staple length. That was accomplished in the attenuating stream. When the HERM team was able to eliminate the hot gas blast attenuation, and still produce fibers less than 7 M, they had to develop some method for breaking the fibers into staple length. The references in the record to the use of other means for cutting continuous filaments permits the inference that mechanical cutters would not break fibers into staple length, because there was neither enough tension on the fibers nor a sufficient volume of them.

---

**30.** Each claim in a patent must be treated as a separate invention. The independent claims of the patent in suit, Claims 1 and 6, each include both the fiberizing method and the air ring. The parent application claimed the fiberizer and the air ring in two separate claims as two independent inventions, all of which were rejected. The patent office continued to reject the method and apparatus for fiberizing alone. See Plaintiff's Exhibits 2, 3 and 6.

(Plaintiff's Exhibit 69—discussing a means for cutting continuous roofing reinforcement fibers.) To solve the problem, the team developed the air ring.

Thus, the combination of two arguably old processes has joined to create a "new and useful function"; staple fibers for insulation less than 7 M in diameter without the need for hot gas blast attenuation. *Firestone v. Aluminum Co. of America,* 285 F.2d 928, 930 (6th Cir.1960). The Court will not engage in hindsight: "The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be striken down." *Firestone, supra.*

The Court concludes that the patent in suit is a valid combination, and not obvious. Where patents have been rejected as aggregations, the inventions have been relatively simple in non-technical fields of art. *A & P Tea Co. v. Supermarket Co., supra* (grocer's tray and counter); *Sakraida v. Ag Pro, Inc., supra* (barn sweeper, comprised of 13 old inventions). In contrast, the level of skill in this art is high. The fact that this combination had not been thought of, or even needed until plaintiff centrifuged less than 7 M fibers without hot gas blast attenuation, establishes the nonobviousness of the patent.

### 5. *Secondary Considerations*

■ As quoted above, in determining whether an invention is obvious, the Court may also look at such factors as commercial success of the invention, long unmet need in the art for such an invention and skepticism of those skilled in the art as to the invention's success. *Graham v. John Deere, supra.* Although these considerations will not sustain the validity of an otherwise obvious invention, *Eltra Corp. v. Basic, Inc.,* 599 F.2d 745, 756 (6th Cir. 1979), they do serve to buttress the Court's

conclusion that J–M's invention was not obvious.

(a) *Commercial Success*—J–M has implemented the patented invention, albeit with the refinement of a heated spinner ambient, at six facilities, investing some 125 million dollars in the conversion. The fiberizer and air rings, as finally commercialized, have produced over $120 million worth of fiberglass insulation since coming on line. That Guardian selected plaintiff's process to copy, rather than a competitor's, further proves the commercial success of the patent.

(b) *Long Felt Need*—The art's need for a process which eliminated hot gas blast attenuation was first expressed in the nonworkable Thomas patent of 1940 which attempted to produce fibers without hot gas blast attenuation. A perusal of the prior art reflects the complexity, expense and difficulties inherent in hot gas blast attenuation. Eliminating the process completely would have obviated the need for the interim solutions of other inventors, e.g. *Stalego* and *Warkoczewski, supra.*

(c) *Skepticism*—When Smith proposed using extremely small holes for fiberizing, he was warned of Don Simmers' earlier failures, as well as of those of others. The Court can conceive of no more compelling evidence of skepticism than the disbelief of those skilled in the art.

In view of the above, the Court concludes that plaintiff's invention has met all the requirements of inventiveness and is nonobvious under the standards of § 103.

### 6. *Disclosure of the Best Mode*

■ Although a patent may satisfy the three tests of utility, novelty and nonobviousness, as does the patent in suit, it may nevertheless be invalidated if the inventors have failed to disclose the best mode of implementing the patented invention. 35 U.S.C. § 112.[31]

---

**31.** 35 U.S.C. § 112 states:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which

it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. The specification shall conclude with one or more claims particularly pointing out and dis-

There is no dispute that plaintiff disclosed the best mode of the invention in the original application, filed December 22, 1972. Defendants urge, however, that when plaintiff filed a subsequent continuation in part application, January 27, 1975, the inventors were obligated to also disclose refinements that had been developed in the interim. Defendants claim that J–M failed to disclose the heat shield combustion chamber, trade secret No. 6, and the alternating straight and vee jets on the air ring, trade secret No. 8, and that therefore the patent is invalid.

■ The obligation to disclose is met if the best mode is disclosed anywhere in the patent, including specifications and drawings. *Acme Highway Products Corp. v. D.S. Brown Co.*, 431 F.2d 1074, 1079 (6th Cir.1970), *cert. denied* 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971). Furthermore, as long as the original application at the time of filing discloses the best mode known at the time of filing, subsequent applications, including continuations in part, are entitled to the benefits of the earlier filing date under certain conditions:

> [T]he later application must: (a) disclose an invention which had previously been disclosed in the manner provided in 35 U.S.C. § 112 in an earlier application; (b) be by the same inventor; (c) be filed before the abandonment of the prior application; (d) expressly refer to the prior application. 35 U.S.C. § 120 (1964).

■ Plaintiff's continuation in part application, filed on January 27, 1975, meets all of the above requirements and is therefore entitled to the December 22, 1972 filing date of the parent application. There is no dispute that the parent application met all the disclosure requirements of § 112, including the best mode requirement, that the same inventors were involved in both the parent application and its successors, and that the continuation in part was filed prior to the abandonment of the parent application on March 27, 1975 (see plaintiff's exhibit 2, p. 124) which was explicitly referred to in the continuation in part application. Therefore the Court concludes that J–M's obligation to disclose the best mode has been satisfied by the disclosures of the parent application.

■ The heat shield combustion chamber (trade secret No. 6) was first disclosed August 28, 1973, in a HERM status report by Don Simmers. (Plaintiff's Exhibit 46). Plaintiff would have been obligated to disclose this refinement if it were essential to the successful practice of the invention, and if it related to amendments to the continuation in part which were not present in the parent application. Neither of those conditions obtains. None of the alterations made in J–M's CIP application was related to the heat shield disclosure in the original application. The same drawings were used throughout the application process. The disclosure and specifications which related to the heat shield were not changed during the application process and, therefore, were not a factor in the ultimate decision to grant the patent. Plaintiff, not being aware that the heat shield combustion chamber comprised the best mode of the invention on December 22, 1972, was under

tinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

no obligation to disclose it on a continuation in part application. *See Sylgab Wire & Steel Corp. v. Imoco Gatway Corp.*, 357 F.Supp. 657, 659 (N.D.Ill.1973).

The parties dispute when the HERM development team first concluded that the *best* mode of operating the air rings was the alternating straight and vee jets, which was disclosed by Simmers in a report dated April 23, 1975. (Plaintiff's Exhibit 72). There is no credible, documented testimony [32] to support Faulkner's assertion that the vee jets were in use prior to January 27, 1975, or that they were known to be the *best* mode of operating the air ring at the time the continuation in part was filed.[33]

The Court is constrained to conclude that J–M has satisfied all obligations to disclose the best mode, and that there is no basis for invalidating the patent for failure to comply with 35 U.S.C. § 112.

### D. *Infringement*

 Having concluded that the patent in suit is valid, the Court must now determine whether Guardian's Albion operation infringes its teachings. Infringement is measured by the language of the claims. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). While the minor variations between defendant's apparatus and process, and those of plaintiff might preclude a finding of literal infringement, there can be no doubt that the Albion fiberizer and air ring read on the claims of the patent in suit by producing fibers less than 7 M in diameter through holes less than 18

mils without hot gas blast attenuation, which fibers are then broken into staple lengths by streams of moving gas, alternating with relatively quiescent zones.

Therefore under the doctrine of equivalents,[34] if not literally, defendant has infringed the patent in suit. Nor is there anything in the patent's file wrapper history which would estop J–M from proving that defendant's means, process and results are substantially similar to its own. Defendant's arguments that its process doesn't infringe either because it uses external attenuation, or because its process actually is a type of two step hot gas blast attenuation are without merit.

Albion's entire hot end, but especially the fiberizer and air ring at the heart of the operation, reflect Guardian's animus of appropriating plaintiff's concepts, yet altering them in an attempt to disguise the form while retaining the function. This sort of premeditated "imperfect infringement" is infringement nevertheless, and Guardian is guilty of it. *Lever Bros. Co. v. Procter and Gamble Manufacturing Co.*, 139 F.2d 633, 642 (4th Cir.1943). See also Faulkner's risk analysis of the likelihood of patent litigation in setting up the Albion line. (Plaintiff's Exhibit 125).

Both the fiberizer of J–M's '386 patent, and the Albion fiberizer, produce fibers around 5.5 M in diameter through holes less than 18 mils without using hot gas blast attenuation. Plaintiff's exhibit 129 documents a test conducted on June 9, 1981

---

**32.** The Court's conclusion again turns on its perception of the credibility of defendant Faulkner. His statements (Tr. 3021, 3256–58) that the vee jets were used on the 1974 HERM pilot line are not corroborated elsewhere in the record. Although Faulkner referred to a drawing "dated early January of '75" that showed the alternating straight and vee jets, which he viewed at a Richmond document inspection after suit was instituted, no drawing has been produced. Such meager evidence cannot rebut J–M's clear documentation that the jets were first disclosed as the *best* mode on April 23, 1975, after the CIP had been filed.

**33.** Because the continuation made only minor technical and clerical changes to the claims and

specifications, no obligation arose to update disclosures when it was filed September 20, 1976. *Sylgab, supra*, at 658. Furthermore, because the continuation, like the continuation in part, met all of the requirements of 35 U.S.C. § 120, J–M remained entitled to the benefits of the earlier filing date.

**34.** "This doctrine allows a patentee to recover for infringement when the patent does not literally read on the accused device, but the device nonetheless 'performs substantially' the same function in substantially the same way to obtain the same result. *Graver v. Linde*, 339 U.S. 605 [70 S.Ct. 854, 94 L.Ed. 1097] ... (1950)." *Arco Industries Corp. v. Chemcast Corp.*, 633 F.2d 435, 438 (6th Cir.1980).

by Simmers of J–M, and Chenoweth of Guardian, at J–M's request using Guardian's equipment. Under the operating conditions of 10:1 air-gas ratio in the spinner interior, using an 8-hour-old spinner, and with an air ring pressure of 30 psi, defendant's equipment produced fiber diameters which averaged 5.4 M. With the addition of heated ambient, fibers between 3.7 and 4 M were produced, the same as J–M's equipment produced when operated with fuel rich spillover.

Faulkner had earlier tried using larger diameter holes and found those larger than 18 mils did not directly centrifuge fine enough fibers. Tr. 1506. His abandoned efforts to use 19 mil holes at Albion tend to prove that the 18 mil hole size is critical to the fiberization of insulation diameter fibers without hot gas blast attenuation. Defendants were unable to follow their J–M experience without infringing the '386 patent.

Albion and J–M's air rings have the same arrangement of jets, the same strategic placement of the air ring relative to the spinner periphery and employ comparable pressure in the straight nozzle jets. Neither has a continuous curtain of air; rather both operate with discrete streams which alternate with quiescent zones.

Despite extensive efforts, defendants have been unable to establish that the air ring performs any different function on the Albion line than it does for J–M. Plaintiff conducted tests and produced empirical evidence that both plaintiff's and defendants' air rings produce air streams and quiescent zones with comparable configurations. Defendants have relied solely on the testimony of Faulkner and Chenoweth to establish that in Albion's process, the fibers are burnt apart in the turbulent and erratic flame zone. Defendant has offered no test data or other documentation to rebut the inference that defendants' air ring is essential to fiberization to break the fibers just as is J–M's. The Court concludes that defendants' use of an air ring with circumferentially spaced jets interspersed with which are relatively quiescent zones is a direct

infringement of claims 1 and 6 of J–M's '386 patent.

### 1. *The Heated Spinner Ambient*

Both defendant and J–M, on their commercial lines, have added the improvement of a heated spinner ambient to the fiberizer and the air ring of the '386 patent. Defendant, relying on this addition to the process, has advanced two arguments to avoid a finding of infringement.

First, this heated ambient constitutes an additional external attenuation source, and therefore is outside the scope of the patent, which, defendant asserts, teaches the elimination of *all* external attenuation. This argument is based on a misinterpretation of file wrapper history, which teaches only the elimination of hot gas blast attenuation.

As detailed earlier in this opinion, the patent includes any process that produces fibers of less than 7 M through holes less than 18 mils in diameter, as long as the process does not use hot gas blast attenuation. During the prosecution of the application, plaintiff abandoned the claim that their invention eliminated all external attenuation, in favor of claims that teach the elimination only of hot gas blast attenuation. Defendant's first argument is based on the erroneous assumption that the addition of *any* type of external attenuation will prevent infringement. Defendants have ignored the file wrapper history, and read J–M's claims too narrowly.

The use by both plaintiff and defendant of additional heat without blast attenuation is an improvement to the patent in suit which enhances centrifugal attenuation, not an avoidance of the patent's teaching. The use of non-hot gas blast attenuation neither saves defendant from infringing, *Noll v. O.M. Scott & Sons Co.*, 467 F.2d 295, 301–02 (6th Cir.1972); *Temco Electrical Motor Co. v. Apco Mfg.*, 275 U.S. 319, 328, 48 S.Ct. 170, 173, 72 L.Ed. 298 (1928) ("the improver without license is an in-

fringer"), nor does its addition render the patent a paper patent.[35]

## 2. *Air Ring*

Defendant's second argument to avoid a finding of infringement is that the Albion process does indeed rely on hot gas blast attenuation but has separated it into two steps, which reliance precludes a finding of infringement. Defendant asserts that the heat is provided by the fuel/air manifold which heats the fiberizer ambient. With this statement, the Court has no quarrel. Defendant also asserts, however, that the air ring provides a continuous annular blast which attenuates the plastic fibers. The Court has found previously that Guardian's air ring produces, not a continuous curtain of air as Faulkner and Chenoweth testified, but rather discrete moving streams, at pressures too low to attenuate, interspersed with quiescent zones, so that no attenuating *blast* exists.

Defendant also asserted that the two step hot gas blast attenuation involves in part an attenuation effect produced by the turbulence surrounding the spinner, allegedly due to the inspiration of air to "lean out", or burn the 2:1 gas rich mixture from the fuel-air manifold. Defendant, however, has not documented either the existence of a turbulent zone surrounding the spinner, or that it operates to attenuate and burn through the fibers as does hot gas blast attenuation.

The Court is skeptical that turbulence, if any indeed exists, actually assists with attenuation. The prior art teaches the deleterious effects of turbulence on fiber attenuation and several patents have been granted which sought to reduce turbulence. *See e.g., Periat,* # 3,841,854, Col. 1, 11. 25–29 (Plaintiff's Exhibit 9A, McMcMc); *Levecque,* French, # 731,050, p. 72 (Plaintiff's Exhibit 2); *Kleist,* # 3,523,774, Col. 2, 11. 8–10, 43–51 (Plaintiff's Exhibit 9B, Q); *Kleist,* # 2,949,632 (Plaintiff's Exhibit 9A, Mc). The recurrent discussion of the *prob-*

*lem* of turbulence persuades the Court that the enhanced attenuation experienced by defendant is not produced by the turbulence, but probably in spite of it.

To compensate for the lack of empirical evidence supporting either the turbulence or two-step hot gas blast attenuation theories, Faulkner set forth calculations which purported to demonstrate the existence of an attenuation effect in addition to that of centrifugal force in an unheated spinner ambient, which is the only attenuation covered by his original theoretical model.

The new derivation was based on calculations done after commencement of this litigation. The utility of the post hoc theoretical model is suspect. Faulkner based his model on an assumed baseline of 1 as the starting point for comparisons of relative attenuation processes and effects among Guardian; J–M's processes, including HERM, S–X and pot and marble; and competitors, without adequately justifying his initial assumption. The Court can only conclude that the superficial and hasty presentation was included to obfuscate rather than educate. While the Court is persuaded some enhanced attenuation does exist because of the heated ambient, it is not persuaded that it occurs as defendant explains it.

Faulkner's explanations concerning the existence of two-step hot gas blast attenuation and attenuation due to turbulence do not conform to his earlier explanations made both while at J–M and Guardian, as revealed in the J–M invention disclosure (Plaintiff's Exhibit 70) and Guardian's patent application (Plaintiff's Exhibit 7). Both of these rely on the fibers' increased susceptibility to centrifugal attenuation because the nascent fibers' plastic state is prolonged in the heated ambient. Nor is this explanation, which plaintiff also adopted, rebutted by Faulkner's post hoc model, or later "evolving theories."

---

**35.** Defendant urges that J–M's reliance on a heated spinner ambient renders '386 a "paper patent" which is not used in commercial production. Even an unused patent is valid, however. *See Special Equipment Co. v. Coe,* 324 U.S. 370, 65 S.Ct. 741, 89 L.Ed. 1006 (1945). Whether '386 is a "paper patent" or not is irrelevant to the question of defendant's infringement of it.

Because of the nature of the fiberizing process, absolute certainty as to what actually happens is not possible, so that the Court is compelled to rely on inferences from test data, references from the prior art, and the credibility of the experts who interpret them. The Court finds that defendant's fiberizer infringes that of the patent in suit, that defendant's air ring functions, not with a continuous annular blast, but with discrete streams which break the fibers, and that there is nothing in defendant's process which constitutes hot gas blast attenuation that would take Guardian's process at Albion outside the scope of the '386 patent.

## VII. NON-PATENT ISSUES

Plaintiff's non-patent claims arise from Guardian's alleged conduct of appropriating J–M's trade secrets and competing unfairly by hiring the core of J–M's HERM development team to set up the competing Albion line. J–M also charges that the individual defendant employees breached their employment contracts, and their fiduciary duties because the defendants relied on knowledge and skill acquired while J–M employees to set up and operate the Albion line. The legal issues raised by plaintiff's claims are interrelated; and are governed by Michigan law, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), over which the Court has pendent jurisdiction. *See generally*, 13 Wright, Miller & Cooper, *Federal Practice & Procedure*, § 3582 at 557–58.

### A. *Trade Secrets*

J–M has charged defendant Guardian with the appropriation of nine alleged trade secrets, which were detailed, *supra*.

1. Integral cooling jacket
2. Batch spreader with two independently driven rings
3. Water cooled tube trough
4. Forehearth minispinner
5. Dropped (spinner geometry)
6. Spinner combustion chamber
7. Heated spinner ambient
8. Air ring with alternating straight and vee jets
9. Water spray fiber quench

Both parties are in accord that the following seven factors constitute the parameters of the Court's inquiry, having been adopted by the Michigan Supreme Court in *Manos v. Melton*, 358 Mich. 500, 508, 100 N.W.2d 235 (1960):

Ellis on Trade Secrets, § 239, pp 324, 325, recognizes 7 factors for consideration as to the existence of a legally protectible trade secret:

(1) The amount of labor and money expended. Those factors rather than brilliance of conception or execution determine whether an idea or information is worthy of court protection.

(2) The idea should be embodied or be capable of being embodied in concrete form to be protectible as a trade secret.

(3) Trivial advances or differences in formulas or process operation are not protectible as trade secrets.

(4) The plaintiff must prove that he was in possession of the alleged trade secret at the time defendant is alleged to have obtained it from plaintiff or one of his employees.

(5) Where the alleged trade secret was known to the recipient prior to its disclosure to him, the recipient is free to use it.

(6) A trade secret may not be protected if it is known generally to the trade although not known to the recipient.

(7) Plaintiff must prove that secrecy has been maintained either by nondisclosure or disclosure in confidence.

Certain of these elements are common to all of the alleged trade secrets. Their existence *vel non* will be discussed seriatim, prior to evaluating the details of each individual trade secret, to determine whether advancement was trivial, or whether the trade secret was generally known in the trade, and whether defendant used it.

### 1. *Labor and Money Expended*

An improvement or refinement is not entitled to trade secret protection unless sufficient money and time have been

expended on its development to make it "worthy of court protection." *Manos, supra.* The record reflects that J–M expended in excess of 9 million dollars and over 150 man years overall on the HERM development project from 1972 to 1977. See Summary at Plaintiff's Exhibit 164. This aggregate dollar amount was based on a summary prepared for this litigation by Don Simmers and Joseph Page, a J–M accountant, which details by project number the money that J–M expended in development efforts. While it is true, as defendant points out, that there is no one to one correspondence between the expenditures listed, hours invested, and the claimed trade secrets, it is inherent in the nature of an ongoing ad hoc problem-solving enterprise that records may not precisely reflect the allocation of resources among the subparts of the project. Neither a detailed analysis nor counting of sums expended is necessary to support the Court's conclusion that adequate time and money have been expended on the development of the alleged trade secrets to entitle them to the Court's protection.

### 2. *Concrete Embodiment*

Of the eight alleged trade secrets, defendant only challenges that trade secret no. 7, the heated spinner ambient, lacks a concrete embodiment. Defendant's argument, that a process which specifies engulfing the exterior of spinner periphery in flames is not concrete, overlooks the fact that Michigan law protects "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Allis Chalmers Mfg. Co. v. Continental Aviation and Eng. Corp.,* 255 F.Supp. 645, 653 (E.D.Mich.1966).

The Court concludes that the provision of a heated spinner ambient is sufficiently concrete to satisfy the requirement of Michigan law, and that the second element of the test has been satisfied for all eight remaining trade secrets.

### 3. *Ownership of the Trade Secrets*

By virtue of the employment agreements which were signed by all defendants who participated in the development of the enumerated trade secrets, J–M, the parent corporation became the owner of all of them. Notwithstanding the fact that the defendants may have been employed by various subsidiaries at the time of development, the defendants' hypertechnical argument that the parent did not own the trade secret because it had not directly employed the developer cannot prevail in the face of the clear language of the contract.

J–M's ownership interests as the parent corporation were duly transferred to plaintiff Manville Corporation by J–M's assignments of October 30, 1981. (Plaintiff's Exhibit 163A and 163B). Both J–M and Manville are parties to this suit, and are the only ones necessary to enforce their ownership interests in the alleged trade secrets.[36] The Court concludes J–M has proven that it owned the trade secrets at the time defendants allegedly appropriated them.

### 4. *Prior Knowledge of the Recipient, Guardian*

Defendant Guardian cannot be liable for the use of a trade secret which it knew of prior to disclosure by the individual defendants. The Court has found, however, that Guardian had no prior experience in fiberglass insulation, and had no expertise in the art until it hired plaintiff's employees and reassembled the HERM development team at Albion. Guardian first

---

**36.** Defendants urged in their post-trial briefs that the employing subsidiaries, J–M Sales, J–M Fiberglass, and J–M Products, were indispensable parties to this litigation because of their status as defendants' employers and owners of the trade secret. The Court concludes that defendants' indispensable party argument, made at the conclusion of so lengthy a trial as this, is untimely. To dismiss at this late date the state law claims, over which the Court has exercised pendent jurisdiction, would be an egregious waste of both the Court's and the litigants' resources, as well as an abuse of discretion. See 7 Wright & Miller, *Federal Practice & Procedure,* § 1609, at pp. 85–90.

learned of the enumerated trade secrets and other aspects of HERM technology when the individual defendants breached their employment contracts with and fiduciary duties to J–M by disclosing confidential information acquired while they were employed by J–M. It is of more than passing interest to note that Guardian did not produce a single witness who was employed by it and had any prior experience or training in fiberglass insulation who had not also been previously employed by J–M. Defendant's reliance on having acquired information from Reichold about the melter is of no assistance, when the record does not establish that this information was acquired before Guardian acquired it from the individual defendants. The Court concludes that Guardian first acquired knowledge of the enumerated trade secrets from plaintiff's former employees.

### 5. *Maintenance of Secrecy by Non-Disclosure or Disclosure in Confidence*

 J–M's enumerated trade secrets are not entitled to the Court's protection if the owner has not maintained them in secrecy. Under Michigan law, the standard for secrecy is that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality. *Kubik, Inc. v. Hull,* 56 Mich.App. 335, 347–48, 224 N.W.2d 80 (1974). The Restatement of Torts § 757 (1939), which Michigan has adopted, see *Manos, supra,* requires only "substantial secrecy." *A.H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11, 16 (2d Cir.1968), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968).

Plaintiff introduced both exhibits and testimony to document its efforts at maintaining secrecy at the HERM development area, and commercial installations, by employee warnings, including oversight programs for publications, physical barriers, visitor control systems, and vendor secrecy agreements. (Plaintiff's Exhibit 39, 91–124).

All employees involved in the HERM development project, including defendants, had signed employment contracts which included secrecy provisions. J–M distributed a President's Bulletin, dated January 8, 1975, which apprised employees that any information not officially published by J–M was considered "insider information" and disclosure of it could subject the employee to legal action. (Plaintiff's Exhibit 99). Part time employees likely to come into contact with confidential material were required to sign a nondisclosure agreement. (Plaintiff's Exhibit 96).

Many of the defendants wrote reports on company forms designated "Confidential." The management circulated periodic bulletins concerning the appropriate subject matters for scientific papers, Plaintiff's Exhibit 92, and security clearance for external communications, Plaintiff's Exhibit 102.

Special attention was given to the HERM development site. Harv Smith, by a memorandum dated July 11, 1972, recommended providing locking gates for staircases leading to the HERM area, and hanging curtains to maintain the secrecy of the HERM project. Memo to Don Simmers, cc to Faulkner, Plaintiff's Exhibit 91. The curtains were hung in 1973.[37] Simmers Deposition at 117, Defendant's Exhibit AG. In the same memo, Smith encouraged limiting even employee access to those with a "need to know."

The corporation as a whole followed a policy of requiring prior approval for plant visitors, as well as the specification of certain areas as off-limits. President's Bulletin: Authorizing Visits to Plants and Mines. October 16, 1978, revision of earlier memo dated July 28, 1972. Plaintiff's Exhibit 118.

The Richmond plant took special precautions. John Mikulak, Richmond plant manager, set forth sign-in and clearance procedures. Memo dated June 23, 1976 (Plain-

---

**37.** Faulkner's testimony that the curtains were hung not to preserve secrecy, but to control cold draft in the fiberizing area, contributed to the Court's conclusion that he lacks credibility as a witness.

tiff's Exhibit 109), which was circulated with Faulkner's added endorsement: "*Note:* This policy is reasonable and *must* be followed in all cases." (Emphasis in original). This document supports the inference that Faulkner was not only aware of the secret and confidential nature of his work, but also responsible for maintaining that secrecy, and rebuts his contentions that he was not aware of the need for confidentiality.

Plant visitors, whether vendors, potential employees, or open house guests, were for the most part subject to the recommended sign-in and screening procedures, and were either escorted by a J–M employee, or known to the HERM team. Furthermore, J–M required its vendors and outside consultants to execute confidentiality agreements. Drawings, prints and specifications exchanged between J–M and its vendors were designated confidential, and access was limited to information necessary for design and manufacturing purposes. Though parts drawings may on occasion have been shown to a limited number of outsiders for a particular purpose, "[T]his [does] not in itself necessarily destroy the secrecy which protected them before they were so disclosed." *A.H. Emery Co., supra*, 389 F.2d at 16.

Simmers testified as to the physical barriers at two of J–M's commercial installations, and the need to make special arrangements to leave after the gates were locked. Smith, one of the inventors of the '386 patent, testified in his deposition of the difficulty of getting clearance to visit the HERM development site after he had been promoted and transferred to another division.

It appears that J–M held open houses at several of its facilities, including Richmond and Innisfail. The record, however, is unsatisfactory as to the nature and extent of the open houses, because most of the information was contained in newspaper clippings, the contents of which were not verifiable. Therefore, the Court declines to enter specific findings where there is no corroborative testimony.

Lester Fisher testified that he was a guide for a Richmond plant tour that had been arranged for employee families and neighbors, not the public at large. He showed 200 people through the plant and, although they were shown the entire S–X process, their view of HERM was limited to the cold end and a TV monitor focused on the melt stream at the hot end.

Assuming, for the sake of completeness, that other similar tours were conducted for local citizens and church groups, the Court concludes that the circumstances of chaperoned tours for lay persons do not constitute the sort of disclosure which would vitiate J–M's right to trade secret protection. This is especially so when the nature of the art is considered. The operation of the fiberizer and its interaction with the air ring is not yet completely understood by the Court, or even its developers. It is unlikely that the trade secrets were susceptible to appropriation by the cursory glance of a tourist, who was unlikely to appreciate the value or exploit what was seen anyway.

█ Defendant also urges that J–M has lost the right to trade secret protection because two of its employees have published a book entitled *Fiberglass*. J.G. Mohr and W. Rowe, *Fiberglass* (1978). The information contained therein, however, is very general and drawings which might relate to the trade secrets are schematic. The publication of a general description of an alleged trade secret does not vitiate plaintiff's claim for protection. See *Clark v. Bunker*, 453 F.2d 1006, 1010 (9th Cir. 1972).

Finally, there is no merit to defendant's argument, which is unsupported by any authority, that plaintiff cannot now claim as trade secrets those things not identified from the outset as trade secrets. The Court has found that employees executed confidentiality agreements, and that plaintiff treated the entire HERM line as confidential.

The defendant employees, even if they had not been told that the information was secret, should have been able to so con-

clude from the very nature of their work. "Educated employees ... should be aware that the information is not meant to be ... used to the disadvantage of its owner." *A.H. Emery, supra*, 389 F.2d at 16. Defendants introduced in evidence the Winder employee manual (Defendant's Exhibit L) which is silent about confidentiality. It appears, however, to be targeted at production workers, not members of the HERM development team. Guardian has not established that the individual defendants had the manual, nor has it overcome the wording of the employment contract which all individual defendants signed. Furthermore, here as in *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1117 (E.D.Mich.1975), although J–M "did not use the ultimate in policing measures, the professional calibre of its employees, and the nature of its development work made heavy-handed measures unnecessary."

Finally, defendants' arguments that if only they had known a specific item was secret, they would have avoided its appropriation, is disingenuous and indicates an intent to misappropriate as much as they could without getting caught.

As a whole the record demonstrates J–M's policy of conducting research and manufacturing activities in secret by requiring employee and vendor confidentiality agreements and by limiting visitor and vendor access. Therefore, the Court finds plaintiff's efforts to maintain secrecy and confidentiality sufficient to satisfy that prong of Michigan's trade secret test.

 In addition to the seven elements of establishing a trade secret in *Manos*, a trade secret must also constitute valuable information used in one's business which gives the possessor a competitive edge over those without it. *Kubik, Inc. v. Hull*, 56 Mich.App. 335, 347–48, 224 N.W.2d 80 (1974). The value of the alleged trade secrets is illustrated by the cast of the development of commercial HERM in J–M's already operating facility and the five-year

development period. In contrast, the defendant, with no prior fiberglass experience, was operational in less than a year with a *total* investment, including capital expenditures of less than $13 million. The competitive edge is obvious. *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. at 1116, *supra*.

 Finally, under Michigan law, the information must not be readily ascertainable to the general public without hardship or difficulty. *Hayes-Albion Corp. v. Kuberski*, 108 Mich.App. 642, 651, 311 N.W.2d 122 (1981). That element generally applies when the trade secret includes elements of a device for public consumption, which can be reverse engineered to reveal its structural details.[38] That line of cases which holds that physical objects are not secret and, therefore get no trade secret protection, does not apply where the embodiment is in process equipment not sold to the public. *Kubik* is distinguishable, and defendant's argument directed to the obvious physical nature of some of the trade secrets must fail.

The Court may not enjoin Guardian's use of an alleged trade secret unless J–M has established that the refinements were not generally known in the trade, were not trivial, and that defendant actually used them. The Court's final conclusion, therefore, rests on its analysis of these three elements for each alleged trade secret which is still in contention.

PLEASE NOTE THAT PAGES 114 THROUGH 127 HAVE BEEN REMOVED FROM THE OPINION AND FILED SEPARATELY UNDER SEAL.

### B. *Unfair Competition and Employee Obligations*

 Unfair competition is a label designed to reach the conduct of a competitor which departs from the "good faith and

---

**38.** Reverse engineering is the process by which a competitor's product is disassembled, and its components analyzed so that the product can be reproduced.

honest, fair dealing" which is essential to encourage invention in the commercial world. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481–82, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974). The concept is designed to reach confidential matters and fiduciary relations which do not fit within the formal categories of either trade secret or patent protection, yet nevertheless constitute an advantage wrongfully appropriated by defendant. *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.,* 401 F.Supp. 1102, 1113–14 (E.D.Mich.1975) (hereinafter *SDRC v. EMRC*). The concept covers not only useful information that a competitor wrongfully acquires and implements, but the competitive edge a competitor gains by avoiding the developer's blind alleys. *Allis Chalmers Mfg. Co. v. Continental Aviation and Engineering Corp.,* 255 F.Supp. 645, 652 (E.D.Mich.1966).

Whether the defendant is liable for unfair competition cannot be determined without a contemporaneous discussion of the nature of the individual employee's obligations to their former employer. Yet the Court must strike a balance between a former employer's entitlement to fair dealings and business morals, as well as its right to the fruits of its research and development investment, against an individual's right to change employers and still use his general skill and knowledge for the benefit of his new employer. *Allis Chalmers, supra,* at 654.

 The Court has found that all individual defendants signed employment agreements that expressly prohibited the disclosure of *any* developments, even if not patented or trade secrets, either during or after employment. *Supra,* p. 1041. Although Michigan does not enforce covenants not to compete, this type of contract is enforceable. *SDRC v. EMRC,* 401 F.Supp. at 1114–15.

Furthermore, by the same contract all development work done by an employee expressly became the property of the parent corporation, Johns-Manville. There is no merit to defendant's argument that J–M

may not now enforce these provisions because the employers were nonjoined subsidiaries. The assignment clause in the contract is adequate to establish that duties were owed to the parent, as well as the directly employing subsidiaries. Nor does the fact that the employment was terminable at will aid defendants. As J–M correctly argues, the employment was terminable; the obligations were not.

Indeed even if this Court had not found the defendants to be bound by express employment contracts, nevertheless, under the facts at bar, fiduciary obligations arose.

> Where the employer assigns the employee to a specific development task and commits considerable resources and supervision to the project, a confidential relationship arises that prevents the employee from using or disclosing the fruits of his research.

*SDRC v. EMRC,* 401 F.Supp. at 1112.

There can be no doubt that the HERM development project involved the sort of employer investment and supervision which gives rise to an expectation of confidentiality and good faith on the part of the employer, and an obligation on the part of the employee to fulfill that expectation.

Defendants have breached both the contractual and fiduciary obligations by their participation in the start up and operation of the Albion fiberglass line.

Faulkner bore the overall design and operating responsibility at Guardian that he had held at J–M. He continued his developmental work with the heated spinner ambient, and the forehearth mini-spinner approach to fiberization.

Schairer's work on the acquisition and adaptation of electrical controls begun for J–M was continued for Guardian. Sanford's design work on the melt orifice, tube trough, air ring heat shield and experimental fuel-air ring at J–M, reappeared at Guardian, though the individual components were not always well suited to the overall approach.

Chenoweth continued his work as a general assistant to Faulkner and was named co-inventor on similar projects at both J–M and Guardian. Limberg and Nishwitz who were trained in process and operations control at J–M continued those same functions at Guardian, thus ensuring the successful operation of the pirated designs and technology, Limberg bringing with him the most current information on J–M work subsequent to Faulkner's departure.

Such conduct is one aspect of the unfair competition alleged by plaintiff; another is the appropriation of development work which qualifies as trade secrets. Beyond that plaintiff has established the following similarities between J–M's and Guardian's line that support the inference of improper conduct in their acquisition, even though the information was not otherwise protectable.

The Court finds the following J–M fingerprints on Albion's line:

(a) The use of a 3 meter electric kettle melter rather than the 2 meter melter of the patent.

(b) Similar kettle outlet geometry, both of which were designed by Sanford.

(c) Laser pierced holes less than 18 mils.

(d) Guardian's initial use of J–M's 901 glass.

(e) Circumferential spacing of the air ring relative to spinner and air jet configuration.

(f) Corotation of the batch spreader rings.

(g) Batch spreader with independent drives.

(h) Heated spinner ambient.

These similarities belie defendant's protestations of independent development, or that the items were generally known to the trade, and buttress the Court's conclusion that Guardian has competed unfairly by encouraging the informed defendants to divulge J–M's confidences. The conclusions of *Arco Industries Corp. v. Chemcast Corp.*, 633 F.2d 435 (6th Cir.1980), where the Court found no patent infringement, and no trade secrets, due in part to inadequate secrecy, and therefore no unfair competition by defendant's following plaintiff's general approach, is simply inapposite, where the Court has found encroachment on patent and trade secret rights that are intimately connected with a method for producing fiberglass.

 Guardian is also guilty of one other form of unfair competition, the raiding of a competitor's key development people. Although the conduct of Guardian is not as egregious as that disapproved by the Court in *Telex Corp. v. IBM Corp.*, 367 F.Supp. 258, 357–59 (N.D.Okl.1973) *modified on other points*, 510 F.2d 894 (10th Cir.1975), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), nevertheless, defendant succeeded in recruiting the key actors in HERM's development team, and inducing them to breach their contractual and fiduciary obligations. In sum, J–M has established by a clear preponderance of the evidence that Guardian and six individual defendants have engaged in unfair competition, and are liable to plaintiff for damages accountable to such conduct, in part because the individual defendants have breached contractual and fiduciary obligations to their former employer, J–M.

## VIII. INJUNCTIVE RELIEF

Plaintiff has sought two remedies: monetary damages for any patent infringement and wrongful appropriation of its other technology, and injunctive relief. The question of monetary damages, including the propriety of treble damages under 35 U.S.C. § 284, and the award of attorney fees under 35 U.S.C. § 285, is expressly reserved for the damage phase of this proceeding should the parties be unable to otherwise settle this dispute.

Plaintiff first sought a preliminary injunction, but agreed to defer its request until the conclusion of the trial. Since this matter was taken under advisement on June 10, 1982, J–M has again requested a decision on its motion for preliminary injunction, asserting that Guardian is preparing to operate a second fiberglass line at its Albion plant, that is based on the same appropriated technology.

Plaintiff seeks to enjoin three aspects of defendant's conduct:

1. *The Infringement of the Patent*

■ The Court has concluded that the patent in suit is valid, and that the Albion process infringes it. Guardian is hereby enjoined from producing fiberglass insulation with its apparatus and equipment in a manner that infringes the patent in suit, as defined in this opinion.

2. *Disclosure or Use of the Trade Secrets*

The Court has found that the following aspects of J–M's technology constitute trade secrets that Guardian has wrongfully appropriated:

3—Water cooled tube trough

4—Forehearth/mini-spinner

6—Spinner combustion chamber

8—Air ring with alternating straight vee jets

The other items 1, 2, 5, 7 and 9, are not entitled to trade secret protection, and are therefore outside the scope of this injunction.

Defendant Guardian and the individual defendants are hereby enjoined from disclosing these trade secrets to anyone else. Guardian is further enjoined from employing any of these trade secrets in the manufacture of fiberglass insulation.

3. *The Employment of the Six Defendants*

■ Plaintiff seeks to enjoin all remaining named defendants from further employment by Guardian "in the design or operation of fiberglass insulation equipment." The evidence is overwhelming that the individual defendants did participate in the infringement of J–M's patents and the appropriation of supporting technology, in breach of both employment contracts and fiduciary obligations. Nevertheless, to enjoin the individuals from further employment in their field of expertise would be an abuse of discretion.

Two of the employees, Nishwitz and Limberg, had minimal involvement if any in the design of Albion's line, and their role in production is not so pivotal as to support the extreme sanction which plaintiff seeks against them.

The development cadre, Faulkner, Schairer, Chenoweth and Sanford, certainly are more culpable, and yet even the worst offender among these, Faulkner, does not merit being deprived of employment in the only field in which he has any expertise. Furthermore, at this point in time, nearly six years after Faulkner left J–M's employ, much of his skill and knowledge in fiberglass may as well be attributable to employment with Guardian as to his enrollment in the "J–M college of fiberglass knowledge." It would be no more equitable to punish Faulkner for the last 5½ years of his learning than it would be to permit him to unjustly profit from the first 5½ years of experience with J–M. Although the appropriate measure of monetary damages may well be elusive, the injunctive relief sought against the individual defendants is not the appropriate solution. Plaintiff's remedy against them is limited to monetary damages.

The parties shall appear thirty (30) days from the entry of this Order to advise the Court of the possibility of settlement on the damages issue, and to report the steps taken to conform to the Court's injunction.

IT IS SO ORDERED.